# UNITED STATES *v.* MEAD CORP.

No. 99–1434.   Argued November 8, 2000—Decided June 18, 2001

SOUTER, J., delivered the opinion of the Court, in which REHN-QUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, THOMAS, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, *post*, p. 239.

*Kent L. Jones* argued the cause for the United States. With him on the briefs were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Deputy Solicitor*

*General Wallace, William Kanter, Bruce G. Forrest,* and *Neal S. Wolin.*

*J. Peter Coll, Jr.,* argued the cause for respondent. With him on the brief were *Kristen Bancroft* and *Sidney H. Kuflik.**

JUSTICE SOUTER delivered the opinion of the Court.

The question is whether a tariff classification ruling by the United States Customs Service deserves judicial deference. The Federal Circuit rejected Customs's invocation of *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984), in support of such a ruling, to which it gave no deference. We agree that a tariff classification has no claim to judicial deference under *Chevron,* there being no indication that Congress intended such a ruling to carry the force of law, but we hold that under *Skidmore* v. *Swift & Co.,* 323 U. S. 134 (1944), the ruling is eligible to claim respect according to its persuasiveness.

## I

### A

Imports are taxed under the Harmonized Tariff Schedule of the United States (HTSUS), 19 U. S. C. § 1202. Title 19 U. S. C. § 1500(b) provides that Customs "shall, under rules

---

*Briefs of *amici curiae* urging affirmance were filed for the American Association of Exporters and Importers by *Peter Buck Feller, Daniel G. Jarcho,* and *Michael J. Haungs;* for Cargill, Inc., et al. by *John M. Peterson, Michael K. Tomenga, George W. Thompson,* and *Curtis W. Knauss;* for the Customs and International Trade Bar Association by *Sidney N. Weiss* and *David Serko;* for Filofax Inc. by *Charles H. Bayar;* for the Joint Industry Group et al. by *William D. Outman II* and *Bruce N. Shulman;* and for the Tax Executives Institute, Inc., by *Timothy J. McCormally* and *Mary L. Fahey.*

Briefs of *amici curiae* were filed for the United States Association of Importers of Textiles and Apparel et al. by *Walter E. Dellinger* and *Ronald W. Gerdes;* and for Professor Thomas W. Merrill, *pro se.*

and regulations prescribed by the Secretary [of the Treasury,] . . . fix the final classification and rate of duty applicable to . . . merchandise" under the HTSUS. Section 1502(a) provides that

> "[t]he Secretary of the Treasury shall establish and promulgate such rules and regulations not inconsistent with the law (including regulations establishing procedures for the issuance of binding rulings prior to the entry of the merchandise concerned), and may disseminate such information as may be necessary to secure a just, impartial, and uniform appraisement of imported merchandise and the classification and assessment of duties thereon at the various ports of entry."[1]

See also § 1624 (general delegation to Secretary to issue rules and regulations for the admission of goods).

The Secretary provides for tariff rulings before the entry of goods by regulations authorizing "ruling letters" setting tariff classifications for particular imports. 19 CFR § 177.8 (2000). A ruling letter

> "represents the official position of the Customs Service with respect to the particular transaction or issue described therein and is binding on all Customs Service personnel in accordance with the provisions of this section until modified or revoked. In the absence of a change of practice or other modification or revocation which affects the principle of the ruling set forth in the ruling letter, that principle may be cited as authority in the disposition of transactions involving the same circumstances." § 177.9(a).

---

[1] The statutory term "ruling" is defined by regulation as "a written statement . . . that interprets and applies the provisions of the Customs and related laws to a specific set of facts." 19 CFR § 177.1(d)(1) (2000).

After the transaction that gives it birth, a ruling letter is to "be applied only with respect to transactions involving articles identical to the sample submitted with the ruling request or to articles whose description is identical to the description set forth in the ruling letter." § 177.9(b)(2). As a general matter, such a letter is "subject to modification or revocation without notice to any person, except the person to whom the letter was addressed," § 177.9(c), and the regulations consequently provide that "no other person should rely on the ruling letter or assume that the principles of that ruling will be applied in connection with any transaction other than the one described in the letter," *ibid.* Since ruling letters respond to transactions of the moment, they are not subject to notice and comment before being issued, may be published but need only be made "available for public inspection," 19 U. S. C. § 1625(a), and, at the time this action arose, could be modified without notice and comment under most circumstances, 19 CFR § 177.10(c) (2000).[2] A broader notice-and-comment requirement for modification of prior rulings was added by statute in 1993, Pub. L. 103–182, § 623, 107 Stat. 2186, codified at 19 U. S. C. § 1625(c), and took effect after this case arose.[3]

---

[2] The opinion of the Federal Circuit in this case noted that § 177.10(c) provides some notice-and-comment procedures for rulings that have the "'effect of changing a practice.'" 185 F. 3d 1304, 1307, n. 1 (1999). The appeals court noted that this case does not involve such a ruling, and specifically excluded such rulings from the reach of its holding. *Ibid.*

[3] As amended by legislation effective after Customs modified its classification ruling in this case, 19 U. S. C. § 1625(c) provides that a ruling or decision that would "modify . . . or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days" or would "have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions" shall be "published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or

Any of the 46[4] port-of-entry[5] Customs offices may issue ruling letters, and so may the Customs Headquarters Office, in providing "[a]dvice or guidance as to the interpretation or proper application of the Customs and related laws with respect to a specific Customs transaction [which] may be requested by Customs Service field offices . . . at any time, whether the transaction is prospective, current, or completed," 19 CFR § 177.11(a) (2000). Most ruling letters contain little or no reasoning, but simply describe goods and state the appropriate category and tariff. A few letters, like the Headquarters ruling at issue here, set out a rationale in some detail.

B

Respondent, the Mead Corporation, imports "day planners," three-ring binders with pages having room for notes of daily schedules and phone numbers and addresses, together with a calendar and suchlike. The tariff schedule on point falls under the HTSUS heading for "[r]egisters, account books, notebooks, order books, receipt books, letter pads, memorandum pads, diaries and similar articles," HTSUS subheading 4820.10, which comprises two subcategories. Items in the first, "[d]iaries, notebooks and address books, bound; memorandum pads, letter pads and similar articles," were subject to a tariff of 4.0% at the time in controversy. 185 F. 3d 1304, 1305 (CA Fed. 1999) (citing subheading 4820.10.20); see also App. to Pet. for Cert. 46a. Objects in the second, covering "[o]ther" items, were free

---

decision. After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication."

[4] Brief for Customs and International Trade Bar Association as *Amicus Curiae* 5 (CITBA Brief).

[5] *I. e.,* "a Customs location having a full range of cargo processing functions, including inspections, entry, collections, and verification." 19 CFR § 101.1 (2000).

of duty. HTSUS subheading 4820.10.40; see also App. to Pet. for Cert. 46a.

Between 1989 and 1993, Customs repeatedly treated day planners under the "other" HTSUS subheading. In January 1993, however, Customs changed its position, and issued a Headquarters ruling letter classifying Mead's day planners as "Diaries . . . , bound" subject to tariff under subheading 4820.10.20. That letter was short on explanation, App. to Brief in Opposition 4a–6a, but after Mead's protest, Customs Headquarters issued a new letter, carefully reasoned but never published, reaching the same conclusion, App. to Pet. for Cert. 28a–47a. This letter considered two definitions of "diary" from the Oxford English Dictionary, the first covering a daily journal of the past day's events, the second a book including " 'printed dates for daily memoranda and jottings; also . . . calendars . . . .' " Id., at 33a–34a (quoting Oxford English Dictionary 321 (Compact ed. 1982)). Customs concluded that "diary" was not confined to the first, in part because the broader definition reflects commercial usage and hence the "commercial identity of these items in the marketplace." App. to Pet. for Cert. 34a. As for the definition of "bound," Customs concluded that HTSUS was not referring to "bookbinding," but to a less exact sort of fastening described in the Harmonized Commodity Description and Coding System Explanatory Notes to Heading 4820, which spoke of binding by " 'reinforcements or fittings of metal, plastics, etc.' " Id., at 45a.

Customs rejected Mead's further protest of the second Headquarters ruling letter, and Mead filed suit in the Court of International Trade (CIT). The CIT granted the Government's motion for summary judgment, adopting Customs's reasoning without saying anything about deference. 17 F. Supp. 2d 1004 (1998).

Mead then went to the United States Court of Appeals for the Federal Circuit. While the case was pending there this Court decided United States v. Haggar Apparel Co., 526

U. S. 380 (1999), holding that Customs regulations receive the deference described in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). The appeals court requested briefing on the impact of *Haggar*, and the Government argued that classification rulings, like Customs regulations, deserve *Chevron* deference.

The Federal Circuit, however, reversed the CIT and held that Customs classification rulings should not get *Chevron* deference, owing to differences from the regulations at issue in *Haggar*. Rulings are not preceded by notice and comment as under the Administrative Procedure Act (APA), 5 U. S. C. § 553, they "do not carry the force of law and are not, like regulations, intended to clarify the rights and obligations of importers beyond the specific case under review." 185 F. 3d, at 1307. The appeals court thought classification rulings had a weaker *Chevron* claim even than Internal Revenue Service interpretive rulings, to which that court gives no deference; unlike rulings by the IRS, Customs rulings issue from many locations and need not be published. 185 F. 3d, at 1307–1308.

The Court of Appeals accordingly gave no deference at all to the ruling classifying the Mead day planners and rejected the agency's reasoning as to both "diary" and "bound." It thought that planners were not diaries because they had no space for "relatively extensive notations about events, observations, feelings, or thoughts" in the past. *Id.*, at 1310. And it concluded that diaries "bound" in subheading 4810.10.20 presupposed "unbound" diaries, such that treating ring-fastened diaries as "bound" would leave the "unbound diary" an empty category. *Id.*, at 1311.

We granted certiorari, 530 U. S. 1202 (2000), in order to consider the limits of *Chevron* deference owed to administrative practice in applying a statute. We hold that administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make

rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent. The Customs ruling at issue here fails to qualify, although the possibility that it deserves some deference under *Skidmore* leads us to vacate and remand.

## II

## A

When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," *Chevron*, 467 U. S., at 843–844, and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.[6] See *id.*, at 844; *United States* v. *Morton*, 467 U. S. 822, 834 (1984); APA, 5 U. S. C. §§ 706(2)(A), (D). But whether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. "[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,'" *Bragdon* v. *Abbott*, 524 U. S. 624, 642 (1998) (quoting *Skidmore*, 323 U. S., at 139–140), and "[w]e have long recognized that considerable weight should be accorded to an executive department's

---

[6] Assuming in each case, of course, that the agency's exercise of authority is constitutional, see 5 U. S. C. § 706(2)(B), and does not exceed its jurisdiction, see § 706(2)(C).

construction of a statutory scheme it is entrusted to administer . . . ." *Chevron, supra,* at 844 (footnote omitted); see also *Ford Motor Credit Co.* v. *Milhollin,* 444 U. S. 555, 565 (1980); *Zenith Radio Corp.* v. *United States,* 437 U. S. 443, 450 (1978). The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care,[7] its consistency,[8] formality,[9] and relative expertness,[10] and to the persuasiveness of the agency's position, see *Skidmore, supra,* at 139–140. The approach has produced a spectrum of judicial responses, from great respect at one end, see, *e. g., Aluminum Co. of America* v. *Central Lincoln Peoples' Util. Dist.,* 467 U. S. 380, 389–390 (1984) (" 'substantial deference' " to administrative construction), to near indifference at the other, see, *e. g., Bowen* v. *Georgetown Univ. Hospital,* 488 U. S. 204, 212–213 (1988) (interpretation advanced for the first time in a litigation brief). Justice Jackson summed things up in *Skidmore* v. *Swift & Co.:*

> "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U. S., at 140.

---

[7] See, *e. g., General Elec. Co.* v. *Gilbert,* 429 U. S. 125, 142 (1976) (courts consider the " 'thoroughness evident in [the agency's] consideration' " (quoting *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944))).

[8] See, *e. g., Good Samaritan Hospital* v. *Shalala,* 508 U. S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due").

[9] See, *e. g., Reno* v. *Koray,* 515 U. S. 50, 61 (1995) (internal agency guideline that is not "subject to the rigors of the [APA], including public notice and comment," is entitled only to "some deference" (internal quotation marks omitted)).

[10] See, *e. g., Aluminum Co. of America* v. *Central Lincoln Peoples' Util. Dist.,* 467 U. S. 380, 390 (1984).

Since 1984, we have identified a category of interpretive choices distinguished by an additional reason for judicial deference. This Court in *Chevron* recognized that Congress not only engages in express delegation of specific interpretive authority, but that "[s]ometimes the legislative delegation to an agency on a particular question is implicit." 467 U. S., at 844. Congress, that is, may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap. Yet it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which "Congress did not actually have an intent" as to a particular result. *Id.*, at 845. When circumstances implying such an expectation exist, a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise, see *id.*, at 845–846, but is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable, see *id.*, at 842–845; cf. 5 U. S. C. § 706(2) (a reviewing court shall set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

We have recognized a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed. See, *e. g.*, *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 257 (1991) (no *Chevron* deference to agency guideline where congressional delegation did not include the power to "'promulgate rules or regulations'" (quoting *General Elec. Co.* v. *Gilbert*, 429 U. S. 125, 141

(1976))); see also *Christensen* v. *Harris County*, 529 U. S. 576, 596–597 (2000) (BREYER, J., dissenting) (where it is in doubt that Congress actually intended to delegate particular interpretive authority to an agency, *Chevron* is "inapplicable"). It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force.[11]   Cf. *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 741 (1996) (APA notice and comment "designed to assure due deliberation").   Thus, the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication.[12]   That said, and as sig-

---

[11] See Merrill & Hickman, *Chevron's* Domain, 89 Geo. L. J. 833, 872 (2001) ("[I]f *Chevron* rests on a presumption about congressional intent, then *Chevron* should apply only where Congress would want *Chevron* to apply. In delineating the types of delegations of agency authority that trigger *Chevron* deference, it is therefore important to determine whether a plausible case can be made that Congress would want such a delegation to mean that agencies enjoy primary interpretational authority").

[12] For rulemaking cases, see, *e. g., Shalala* v. *Illinois Council on Long Term Care, Inc.*, 529 U. S. 1, 20–21 (2000); *United States* v. *Haggar Apparel Co.*, 526 U. S. 380 (1999); *AT&T Corp.* v. *Iowa Utilities Bd.*, 525 U. S. 366 (1999); *Atlantic Mut. Ins. Co.* v. *Commissioner*, 523 U. S. 382 (1998); *Regions Hospital* v. *Shalala*, 522 U. S. 448 (1998); *United States* v. *O'Hagan*, 521 U. S. 642 (1997); *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735 (1996); *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.*, 515 U. S. 687 (1995); *ICC* v. *Transcon Lines*, 513 U. S. 138 (1995); *PUD No. 1 of Jefferson Cty.* v. *Washington Dept. of Ecology*, 511 U. S. 700 (1994); *Good Samaritan Hospital* v. *Shalala, supra; American Hospital Assn.* v. *NLRB*, 499 U. S. 606 (1991); *Sullivan* v. *Everhart*, 494 U. S. 83 (1990); *Sullivan* v. *Zebley*, 493 U. S. 521 (1990); *Massachusetts* v. *Morash*, 490 U. S. 107 (1989); *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281 (1988); *Atkins* v. *Rivera*, 477 U. S. 154 (1986); *United States* v. *Fulton*, 475 U. S. 657 (1986); *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121 (1985).

For adjudication cases, see, *e. g., INS* v. *Aguirre-Aguirre*, 526 U. S. 415, 423–425 (1999); *Federal Employees* v. *Department of Interior*, 526 U. S.

nificant as notice-and-comment is in pointing to *Chevron* authority, the want of that procedure here does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded, see, *e. g., NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.*, 513 U. S. 251, 256–257, 263 (1995).[13] The fact that the tariff classification here was not a product of such formal process does not alone, therefore, bar the application of *Chevron*.

There are, nonetheless, ample reasons to deny *Chevron* deference here. The authorization for classification rulings, and Customs's practice in making them, present a case far removed not only from notice-and-comment process, but from any other circumstances reasonably suggesting that Congress ever thought of classification rulings as deserving the deference claimed for them here.

## B

No matter which angle we choose for viewing the Customs ruling letter in this case, it fails to qualify under *Chevron*. On the face of the statute, to begin with, the terms of the congressional delegation give no indication that Congress meant to delegate authority to Customs to issue classifica-

---

86, 98–99 (1999); *Holly Farms Corp.* v. *NLRB,* 517 U. S. 392 (1996); *ABF Freight System, Inc.* v. *NLRB,* 510 U. S. 317, 324–325 (1994); *National Railroad Passenger Corporation* v. *Boston & Maine Corp.,* 503 U. S. 407, 417–418 (1992); *Norfolk & Western R. Co.* v. *Train Dispatchers,* 499 U. S. 117, 128 (1991); *Fort Stewart Schools* v. *FLRA,* 495 U. S. 641, 644–645 (1990); *Department of Treasury, IRS* v. *FLRA,* 494 U. S. 922 (1990).

[13] In *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.,* 513 U. S., at 256–257 (internal quotation marks omitted), we quoted longstanding precedent concluding that "[t]he Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of [the rule of deference] with respect to his deliberative conclusions as to the meaning of these laws." See also 1 M. Malloy, Banking Law and Regulation § 1.3.1, p. 1.41 (1996) (stating that the Comptroller is given "personal authority" under the National Bank Act).

tion rulings with the force of law. We are not, of course, here making any global statement about Customs's authority, for it is true that the general rulemaking power conferred on Customs, see 19 U. S. C. § 1624, authorizes some regulation with the force of law, or "legal norms," as we put it in *Haggar*, 526 U. S., at 391.[14] It is true as well that Congress had classification rulings in mind when it explicitly authorized, in a parenthetical, the issuance of "regulations establishing procedures for the issuance of binding rulings prior to the entry of the merchandise concerned," 19 U. S. C. § 1502(a).[15] The reference to binding classifications does not, however, bespeak the legislative type of activity that would naturally bind more than the parties to the ruling, once the goods classified are admitted into this country. And though the statute's direction to disseminate "information" necessary to "secure" uniformity, *ibid.*, seems to assume that a ruling may be precedent in later transactions, precedential value alone does not add up to *Chevron* entitlement; interpretive rules may sometimes function as precedents, see Strauss, The Rulemaking Continuum, 41 Duke L. J. 1463, 1472–1473 (1992), and they enjoy no *Chevron* status as a class. In any event, any precedential claim of a classification ruling is counterbalanced by the provision for independent review of Customs classifications by the CIT, see 28 U. S. C. §§ 2638–2640; the scheme for CIT review includes a provision that treats classification rulings on par with the Secretary's rulings on "valuation, rate of duty, marking, restricted mer-

---

[14] Cf. *Adams Fruit Co.* v. *Barrett*, 494 U. S. 638, 649–650 (1990) (although Congress required the Secretary of Labor to promulgate standards implementing certain provisions of the Migrant and Seasonal Agricultural Worker Protection Act, and "agency determinations within the scope of delegated authority are entitled to deference," the Secretary's interpretation of the Act's enforcement provisions is not entitled to *Chevron* deference because "[n]o such delegation regarding [those] provisions is evident in the statute").

[15] The ruling in question here, however, does not fall within that category.

chandise, entry requirements, drawbacks, vessel repairs, or similar matters," § 1581(h); see § 2639(b). It is hard to imagine a congressional understanding more at odds with the *Chevron* regime.[16]

It is difficult, in fact, to see in the agency practice itself any indication that Customs ever set out with a lawmaking pretense in mind when it undertook to make classifications like these. Customs does not generally engage in notice-and-comment practice when issuing them, and their treatment by the agency makes it clear that a letter's binding character as a ruling stops short of third parties; Customs has regarded a classification as conclusive only as between itself and the importer to whom it was issued, 19 CFR § 177.9(c) (2000), and even then only until Customs has given advance notice of intended change, §§ 177.9(a), (c). Other importers are in fact warned against assuming any right of detrimental reliance. § 177.9(c).

Indeed, to claim that classifications have legal force is to ignore the reality that 46 different Customs offices issue 10,000 to 15,000 of them each year, see Brief for Respondent 5; CITBA Brief 6 (citing Treasury Advisory Committee on the Commercial Operations of the United States Customs Service, Report of the COAC Subcommittee on OR&R, Exhs. 1, 3 (Jan. 26, 2000) (reprinted in App. to CITBA Brief 20a–21a)). Any suggestion that rulings intended to have the force of law are being churned out at a rate of 10,000 a year at an agency's 46 scattered offices is simply self-refuting. Although the circumstances are less startling here, with a Headquarters letter in issue, none of the relevant statutes recognizes this category of rulings as separate or different from others; there is thus no indication that a

---

[16] Although Customs's decision "is presumed to be correct" on review, 28 U. S. C. § 2639(a)(1), the CIT "may consider any new ground" even if not raised below, § 2638, and "shall make its determinations upon the basis of the record made before the court," rather than that developed by Customs, § 2640(a); see generally *Haggar Apparel*, 526 U. S., at 391.

more potent delegation might have been understood as going to Headquarters even when Headquarters provides developed reasoning, as it did in this instance.

Nor do the amendments to the statute made effective after this case arose disturb our conclusion. The new law requires Customs to provide notice-and-comment procedures only when modifying or revoking a prior classification ruling or modifying the treatment accorded to substantially identical transactions, 19 U. S. C. § 1625(c); and under its regulations, Customs sees itself obliged to provide notice-and-comment procedures only when "changing a practice" so as to produce a tariff increase, or in the imposition of a restriction or prohibition, or when Customs Headquarters determines that "the matter is of sufficient importance to involve the interests of domestic industry," 19 CFR §§ 177.10(c)(1), (2) (2000). The statutory changes reveal no new congressional objective of treating classification decisions generally as rulemaking with force of law, nor do they suggest any intent to create a *Chevron* patchwork of classification rulings, some with force of law, some without.

In sum, classification rulings are best treated like "interpretations contained in policy statements, agency manuals, and enforcement guidelines." *Christensen*, 529 U. S., at 587. They are beyond the *Chevron* pale.

## C

To agree with the Court of Appeals that Customs ruling letters do not fall within *Chevron* is not, however, to place them outside the pale of any deference whatever. *Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form, given the "specialized experience and broader investigations and information" available to the agency, 323 U. S., at 139, and given the value of uniformity in its administrative and judicial understandings of what a national law requires, *id.*, at 140. See generally *Metropolitan Stevedore Co.* v.

*Rambo*, 521 U. S. 121, 136 (1997) (reasonable agency interpretations carry "at least some added persuasive force" where *Chevron* is inapplicable); *Reno* v. *Koray*, 515 U. S. 50, 61 (1995) (according "some deference" to an interpretive rule that "do[es] not require notice and comment"); *Martin* v. *Occupational Safety and Health Review Comm'n*, 499 U. S. 144, 157 (1991) ("some weight" is due to informal interpretations though not "the same deference as norms that derive from the exercise of . . . delegated lawmaking powers").

There is room at least to raise a *Skidmore* claim here, where the regulatory scheme is highly detailed, and Customs can bring the benefit of specialized experience to bear on the subtle questions in this case: whether the daily planner with room for brief daily entries falls under "diaries," when diaries are grouped with "notebooks and address books, bound; memorandum pads, letter pads and similar articles," HTSUS subheading 4820.10.20; and whether a planner with a ring binding should qualify as "bound," when a binding may be typified by a book, but also may have "reinforcements or fittings of metal, plastics, etc.," Harmonized Commodity Description and Coding System Explanatory Notes to Heading 4820, p. 687 (cited in Customs Headquarters letter, App. to Pet. for Cert. 45a. A classification ruling in this situation may therefore at least seek a respect proportional to its "power to persuade," *Skidmore, supra,* at 140; see also *Christensen*, 529 U. S., at 587; *id.,* at 595 (STEVENS, J., dissenting); *id.,* at 596–597 (BREYER, J., dissenting). Such a ruling may surely claim the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight.

## D

Underlying the position we take here, like the position expressed by JUSTICE SCALIA in dissent, is a choice about the best way to deal with an inescapable feature of the

body of congressional legislation authorizing administrative action. That feature is the great variety of ways in which the laws invest the Government's administrative arms with discretion, and with procedures for exercising it, in giving meaning to Acts of Congress. Implementation of a statute may occur in formal adjudication or the choice to defend against judicial challenge; it may occur in a central board or office or in dozens of enforcement agencies dotted across the country; its institutional lawmaking may be confined to the resolution of minute detail or extend to legislative rulemaking on matters intentionally left by Congress to be worked out at the agency level.

Although we all accept the position that the Judiciary should defer to at least some of this multifarious administrative action, we have to decide how to take account of the great range of its variety. If the primary objective is to simplify the judicial process of giving or withholding deference, then the diversity of statutes authorizing discretionary administrative action must be declared irrelevant or minimized. If, on the other hand, it is simply implausible that Congress intended such a broad range of statutory authority to produce only two varieties of administrative action, demanding either *Chevron* deference or none at all, then the breadth of the spectrum of possible agency action must be taken into account. JUSTICE SCALIA's first priority over the years has been to limit and simplify. The Court's choice has been to tailor deference to variety.[17] This accept-

---

[17] Compare *Christensen* v. *Harris County*, 529 U. S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference"), and *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 257–258 (1991) (applying *Skidmore* analysis where Congress did not confer upon the agency authority to promulgate rules or regulations), with *Christensen, supra,* at 589–591 (SCALIA, J., concurring in part and concurring in judgment) (urging *Chevron* treatment); *EEOC* v. *Arabian American Oil Co., supra,* at 259–260 (SCALIA, J., concurring in part and concurring

ance of the range of statutory variation has led the Court to recognize more than one variety of judicial deference, just as the Court has recognized a variety of indicators that Congress would expect *Chevron* deference.[18]

Our respective choices are repeated today. JUSTICE SCALIA would pose the question of deference as an either-or choice. On his view that *Chevron* rendered *Skidmore* anachronistic, when courts owe any deference it is *Chevron* deference that they owe, *post*, at 250. Whether courts do owe deference in a given case turns, for him, on whether the agency action (if reasonable) is "authoritative," *post*, at 257. The character of the authoritative derives, in turn, not from breadth of delegation or the agency's procedure in implementing it, but is defined as the "official" position of an agency, *ibid.*, and may ultimately be a function of administrative persistence alone, *ante*, at 258.

The Court, on the other hand, said nothing in *Chevron* to eliminate *Skidmore's* recognition of various justifications for deference depending on statutory circumstances and agency action; *Chevron* was simply a case recognizing that even without express authority to fill a specific statutory gap, circumstances pointing to implicit congressional delegation present a particularly insistent call for deference. Indeed, in holding here that *Chevron* left *Skidmore* intact and applicable where statutory circumstances indicate no intent to delegate general authority to make rules with force of law, or where such authority was not invoked, we hold nothing more than we said last Term in response to the particular

---

in judgment) (urging *Chevron* treatment); see also *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 453–455 (1987) (SCALIA, J., concurring in judgment) (urging broader application of *Chevron*).

[18] It is, of course, true that the limit of *Chevron* deference is not marked by a hard-edged rule. But *Chevron* itself is a good example showing when *Chevron* deference is warranted, while this is a good case showing when it is not. Judges in other, perhaps harder, cases will make reasoned choices between the two examples, the way courts have always done.

statutory circumstances in *Christensen,* to which JUSTICE
SCALIA then took exception, see 529 U. S., at 589, just as he
does again today.

We think, in sum, that JUSTICE SCALIA's efforts to sim-
plify ultimately run afoul of Congress's indications that dif-
ferent statutes present different reasons for considering
respect for the exercise of administrative authority or defer-
ence to it. Without being at odds with congressional intent
much of the time, we believe that judicial responses to ad-
ministrative action must continue to differentiate between
*Chevron* and *Skidmore,* and that continued recognition of
*Skidmore* is necessary for just the reasons Justice Jackson
gave when that case was decided.[19]

\*    \*    \*

Since the *Skidmore* assessment called for here ought to be
made in the first instance by the Court of Appeals for the

---

[19] Surely Justice Jackson's practical criteria, along with *Chevron's* con-
cern with congressional understanding, provide more reliable guideposts
than conclusory references to the "authoritative" or "official." Even
if those terms provided a true criterion, there would have to be some-
thing wrong with a standard that accorded the status of substantive law
to every one of 10,000 "official" customs classifications rulings turned out
each year from over 46 offices placed around the country at the Nation's
entryways. JUSTICE SCALIA tries to avoid that result by limiting what
is "authoritative" or "official" to a pronouncement that expresses the
"judgment of central agency management, approved at the highest levels,"
as distinct from the pronouncements of "underlings," *post,* at 259, n. 6.
But that analysis would not entitle a Headquarters ruling to *Chevron* def-
erence; the "highest level" at Customs is the source of the regulation at
issue in *Haggar,* the Commissioner of Customs with the approval of the
Secretary of the Treasury. 526 U. S., at 386. The Commissioner did not
issue the Headquarters ruling. What JUSTICE SCALIA has in mind here
is that because the Secretary approved the Government's position in its
brief to this Court, *Chevron* deference is due. But if that is so, *Chevron*
deference was not called for until sometime after the litigation began,
when central management at the highest level decided to defend the
ruling, and the deference is not to the classification ruling as such but
to the brief. This explains why the Court has not accepted JUSTICE
SCALIA's position.

Federal Circuit or the CIT, we go no further than to vacate the judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, dissenting.

Today's opinion makes an avulsive change in judicial review of federal administrative action. Whereas previously a reasonable agency application of an ambiguous statutory provision had to be sustained so long as it represented the agency's authoritative interpretation, henceforth such an application can be set aside unless "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law," as by giving an agency "power to engage in adjudication or notice-and-comment rulemaking, or . . . some other [procedure] indicati[ng] comparable congressional intent," and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Ante,* at 226–227.[1] What was previously a general presumption of authority in agencies to resolve ambiguity in the statutes they have been authorized to enforce has been changed to a presumption of no such authority, which must be overcome by affirmative legislative intent to the contrary. And whereas previously, when agency authority to resolve ambiguity did not exist the court was free to give the statute what it considered the best interpretation, henceforth the court must supposedly give the agency view some indeterminate amount of so-called *Skidmore* deference. *Skidmore* v. *Swift & Co.,* 323 U. S. 134 (1944). We will be sorting out the consequences of the *Mead* doctrine, which has today replaced the *Chevron* doctrine, *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984), for years to come. I would adhere to our established jurisprudence,

---

[1] It is not entirely clear whether the formulation newly minted by the Court today extends to both formal and informal adjudication, or simply the former. Cf., *e. g., ante,* at 230.

defer to the reasonable interpretation the Customs Service has given to the statute it is charged with enforcing, and reverse the judgment of the Court of Appeals.

## I

Only five years ago, the Court described the *Chevron* doctrine as follows: "We accord deference to agencies under *Chevron* . . . because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows," *Smiley* v. *Citibank (South Dakota), N. A.,* 517 U. S. 735, 740–741 (1996) (citing *Chevron, supra,* at 843–844). Today the Court collapses this doctrine, announcing instead a presumption that agency discretion does not exist unless the statute, expressly or impliedly, says so. While the Court disclaims any hard-and-fast rule for determining the existence of discretion-conferring intent, it asserts that "a very good indicator [is] express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed," *ante,* at 229. Only when agencies act through "adjudication[,] notice-and-comment rulemaking, or . . . some other [procedure] indicati[ng] comparable congressional intent [whatever that means]" is *Chevron* deference applicable—because these "relatively formal administrative procedure[s] [designed] to foster . . . fairness and deliberation" bespeak (according to the Court) congressional willingness to have the agency, rather than the courts, resolve statutory ambiguities. *Ante,* at 227, 230. Once it is determined that *Chevron* deference is not in order, the uncertainty is not at an end—and indeed is just beginning. Litigants cannot then assume that the statutory question is one for the courts to determine, accord-

ing to traditional interpretive principles and by their own judicial lights. No, the Court now resurrects, in full force, the pre-*Chevron* doctrine of *Skidmore* deference, see *Skidmore, supra,* whereby "[t]he fair measure of deference to an agency administering its own statute . . . var[ies] with circumstances," including "the degree of the agency's care, its consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position," *ante,* at 228 (footnotes omitted). The Court has largely replaced *Chevron,* in other words, with that test most beloved by a court unwilling to be held to rules (and most feared by litigants who want to know what to expect): th'ol' "totality of the circumstances" test.

The Court's new doctrine is neither sound in principle nor sustainable in practice.

## A

As to principle: The doctrine of *Chevron*—that all *authoritative* agency interpretations of statutes they are charged with administering deserve deference—was rooted in a legal presumption of congressional intent, important to the division of powers between the Second and Third Branches. When, *Chevron* said, Congress leaves an ambiguity in a statute that is to be administered by an executive agency, it is presumed that Congress meant to give the agency discretion, within the limits of reasonable interpretation, as to how the ambiguity is to be resolved. By committing enforcement of the statute to an agency rather than the courts, Congress committed its initial and primary interpretation to that branch as well.

There is some question whether *Chevron* was faithful to the text of the Administrative Procedure Act (APA), which it did not even bother to cite.[2] But it was in accord with the

---

[2] Title 5 U. S. C. § 706 provides that, in reviewing agency action, the court shall "decide all relevant questions of law"—which would seem to mean that all statutory ambiguities are to be resolved judicially. See

origins of federal-court judicial review. Judicial control of federal executive officers was principally exercised through the prerogative writ of mandamus. See L. Jaffe, Judicial Control of Administrative Action 166, 176–177 (1965). That writ generally would not issue unless the executive officer was acting plainly beyond the scope of his authority.

"The questions mooted before the Secretary and decided by him were whether the fund is a tribal fund, whether the tribe is still existing and whether the distribution of the annuities is to be confined to members of the tribe .... These are all questions of law the solution of which requires a construction of the act of 1889 and other related acts. A reading of these acts shows that they fall short of plainly requiring that any of the questions be answered in the negative and that in some aspects they give color to the affirmative answers of the Secretary. That the construction of the acts insofar as they have a bearing on the first and third questions is sufficiently uncertain to involve the exercise of judgment and discretion is rather plain. ...

. . . . .

"From what has been said it follows that the case is not one in which mandamus will lie." Wilbur v. United States ex rel. Kadrie, 281 U. S. 206, 221–222 (1930).

---

Anthony, The Supreme Court and the APA: Sometimes They Just Don't Get It, 10 Am. U. Admin. L. J. 1, 9–11 (1996). It could be argued, however, that the legal presumption identified by Chevron left as the only "questio[n] of law" whether the agency's interpretation had gone beyond the scope of discretion that the statutory ambiguity conferred. Today's opinion, of course, is no more observant of the APA's text than Chevron was—and indeed is even more difficult to reconcile with it. Since the opinion relies upon actual congressional intent to suspend § 706, rather than upon a legal presumption against which § 706 was presumably enacted, it runs head-on into the provision of the APA which specifies that the Act's requirements (including the requirement that judges shall "decide all relevant questions of law") cannot be amended except expressly. See § 559.

Statutory ambiguities, in other words, were left to reasonable resolution by the Executive.

The basis in principle for today's new doctrine can be described as follows: The background rule is that ambiguity in legislative instructions to agencies is to be resolved not by the agencies but by the judges. Specific congressional intent to depart from this rule must be found—and while there is no single touchstone for such intent it can generally be found when Congress has authorized the agency to act through (what the Court says is) relatively formal procedures such as informal rulemaking and formal (and informal?) adjudication, and when the agency in fact employs such procedures. The Court's background rule is contradicted by the origins of judicial review of administrative action. But in addition, the Court's principal criterion of congressional intent to supplant its background rule seems to me quite implausible. There is no necessary connection between the formality of procedure and the power of the entity administering the procedure to resolve authoritatively questions of law. The most formal of the procedures the Court refers to—formal adjudication—is modeled after the process used in trial courts, which of course are not generally accorded deference on questions of law. The purpose of such a procedure is to produce a closed record for determination and review of the facts—which implies nothing about the power of the agency subjected to the procedure to resolve authoritatively questions of law.

As for informal rulemaking: While formal adjudication procedures are *prescribed* (either by statute or by the Constitution), see 5 U. S. C. §§ 554, 556; *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, 50 (1950), informal rulemaking is more typically *authorized* but not required. Agencies with such authority are free to give guidance through rulemaking, but they may proceed to administer their statute case-by-case, "making law" as they implement their program (not necessarily through formal adjudication). See *NLRB* v. *Bell*

*Aerospace Co.*, 416 U. S. 267, 290–295 (1974); *SEC* v. *Chenery Corp.*, 332 U. S. 194, 202–203 (1947). Is it likely—or indeed even plausible—that Congress meant, when such an agency chooses rulemaking, to accord the administrators of that agency, *and their successors*, the flexibility of interpreting the ambiguous statute now one way, and later another; but, when such an agency chooses case-by-case administration, to eliminate all future agency discretion by having that same ambiguity resolved authoritatively (and forever) by the courts?[3] Surely that makes no sense. It is also the case that certain significant categories of rules—those involving grant and benefit programs, for example, are exempt from the requirements of informal rulemaking. See 5 U. S. C. § 553(a)(2). Under the Court's novel theory, when an agency takes advantage of that exemption its rules will be deprived of *Chevron* deference, *i. e.*, authoritative effect. Was this either the plausible intent of the APA rulemaking exemption, or the plausible intent of the Congress that established the grant or benefit program?

Some decisions that are neither informal rulemaking nor formal adjudication are required to be made personally by a Cabinet Secretary, without any prescribed procedures. See, *e. g., United States* v. *Giordano*, 416 U. S. 505, 508 (1974) (involving application of 18 U. S. C. § 2516 (1970 ed.), requiring wiretap applications to be authorized by "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General"); *D. C. Federation of Civic Assns.* v. *Volpe*, 459 F. 2d 1231, 1248–1249 (CADC 1971) (involving application of 23 U. S. C. § 138 (1970 ed.) requiring the Secretary of Transportation to determine that there is "no feasible and prudent alternative to the use of" publicly owned parkland for a federally funded highway), cert. denied, 405 U. S. 1030 (1972). Is it conceivable that decisions

---

[3] See *infra*, at 247–250.

specifically committed to these high-level officers are meant to be accorded no deference, while decisions by an administrative law judge left in place without further discretionary agency review, see 5 U. S. C. § 557(b), are authoritative? This seems to me quite absurd, and not at all in accord with any plausible actual intent of Congress.

## B

As for the practical effects of the new rule:

### 1

The principal effect will be protracted confusion. As noted above, the one test for *Chevron* deference that the Court enunciates is wonderfully imprecise: whether "Congress delegated authority to the agency generally to make rules carrying the force of law, . . . as by . . . adjudication[,] notice-and-comment rulemaking, or . . . some other [procedure] indicati[ng] comparable congressional intent." But even this description does not do justice to the utter flabbiness of the Court's criterion, since, in order to maintain the fiction that the new test is really just the old one, applied consistently throughout our case law, the Court must make a virtually open-ended exception to its already imprecise guidance: In the present case, it tells us, the absence of notice-and-comment rulemaking (and "[who knows?] [of] some other [procedure] indicati[ng] comparable congressional intent") is not enough to decide the question of *Chevron* deference, "for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded." *Ante*, at 226–227, 231. The opinion then goes on to consider a grab bag of other factors—including the factor that used to be the sole criterion for *Chevron* deference: whether the interpretation represented the *authoritative* position of the agency, see *ante*,

at 231–234. It is hard to know what the lower courts are to make of today's guidance.

### 2

Another practical effect of today's opinion will be an artificially induced increase in informal rulemaking. Buy stock in the GPO. Since informal rulemaking and formal adjudication are the only more-or-less safe harbors from the storm that the Court has unleashed; and since formal adjudication is not an option but must be mandated by statute or constitutional command; informal rulemaking—which the Court was once careful to make voluntary unless required by statute, see *Bell Aerospace, supra,* and *Chenery, supra*— will now become a virtual necessity. As I have described, the Court's safe harbor requires not merely that the agency have been given rulemaking authority, but also that the agency have *employed* rulemaking as the means of resolving the statutory ambiguity. (It is hard to understand why that should be so. Surely the mere *conferral* of rulemaking authority demonstrates—if one accepts the Court's logic—a congressional intent to allow the agency to resolve ambiguities. And given that intent, what difference does it make that the agency chooses instead to use another perfectly permissible means for that purpose?) Moreover, the majority's approach will have a perverse effect on the rules that do emerge, given the principle (which the Court leaves untouched today) that judges must defer to reasonable agency interpretations of their own regulations. See, *e. g., United States,* v. *Cleveland Indians Baseball Co.,* 532 U. S. 200, 220 (2001) ("We need not decide whether the [informal] Revenue Rulings themselves are entitled to deference[, . . . because] the Rulings simply reflect the agency's longstanding interpretation of its own regulations"). Agencies will now have high incentive to rush out barebones, ambiguous rules construing statutory ambiguities, which they can then in turn further clarify through informal rulings entitled to judicial respect.

3

Worst of all, the majority's approach will lead to the ossification of large portions of our statutory law. Where *Chevron* applies, statutory ambiguities remain ambiguities subject to the agency's ongoing clarification. They create a space, so to speak, for the exercise of continuing agency discretion. As *Chevron* itself held, the Environmental Protection Agency can interpret "stationary source" to mean a single smokestack, can later replace that interpretation with the "bubble concept" embracing an entire plant, and if that proves undesirable can return again to the original interpretation. 467 U. S., at 853–859, 865–866. For the indeterminately large number of statutes taken out of *Chevron* by today's decision, however, ambiguity (and hence flexibility) will cease with the first judicial resolution. *Skidmore* deference gives the agency's current position some vague and uncertain amount of respect, but it does not, like *Chevron*, *leave* the matter within the control of the Executive Branch for the future. Once the court has spoken, it becomes *unlawful* for the agency to take a contradictory position; the statute now *says* what the court has prescribed. See *Neal v. United States*, 516 U. S. 284, 295 (1996); *Lechmere, Inc. v. NLRB*, 502 U. S. 527, 536–537 (1992); *Maislin Industries, U. S., Inc. v. Primary Steel, Inc.*, 497 U. S. 116, 131 (1990). It will be bad enough when this ossification occurs as a result of judicial determination (under today's new principles) that there is no affirmative indication of congressional intent to "delegate"; but it will be positively bizarre when it occurs simply because of an agency's failure to act by rulemaking (rather than informal adjudication) before the issue is presented to the courts.

One might respond that such ossification would not result if the agency were simply to readopt its interpretation, after a court reviewing it under *Skidmore* had rejected it, by repromulgating it through one of the *Chevron*-eligible procedural formats approved by the Court today. Approving this

procedure would be a landmark abdication of judicial power. It is worlds apart from *Chevron* proper, where the court does not *purport* to give the statute a judicial interpretation— except in identifying the scope of the statutory ambiguity, as to which the court's judgment is final and irreversible. (Under *Chevron* proper, when the agency's authoritative interpretation comes within the scope of that ambiguity—and the court therefore approves it—the agency will not be "overruling" the court's decision when it later decides that a different interpretation (still within the scope of the ambiguity) is preferable.) By contrast, under this view, the reviewing court will not be holding the agency's authoritative interpretation within the scope of the ambiguity; but will be holding that the agency has not used the "delegation-conferring" procedures, and that the court must therefore *interpret the statute on its own*—but subject to reversal if and when the agency uses the proper procedures.

One is reminded of Justice Jackson's words in *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 113 (1948):

> "The court below considered that after it reviewed the Board's order its judgment would be submitted to the President, that his power to disapprove would apply after as well as before the court acts, and hence that there would be no chance of a deadlock and no conflict of function. But if the President may completely disregard the judgment of the court, it would be only because it is one the courts were not authorized to render. Judgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government."

I know of no case, in the entire history of the federal courts, in which we have allowed a judicial interpretation of a statute to be set aside by an agency—or have allowed a

lower court to render an interpretation of a statute subject to correction by an agency. As recently as 1996, we rejected an attempt to do *precisely* that. In *Chapman* v. *United States*, 500 U. S. 453 (1991), we had held that the weight of the blotter paper bearing the lysergic acid diethylamide (LSD) must be counted for purposes of determining whether the quantity crossed the 10-gram threshold of 21 U. S. C. §841(b)(1)(A)(v) imposing a minimum sentence of 10 years. At that time the United States Sentencing Commission applied a similar approach under the Sentencing Guidelines, but had taken no position regarding the meaning of the statutory provision. The Commission later changed its Guidelines approach, and, according to the petitioner in *Neal* v. *United States*, 516 U. S. 284 (1996), made clear its view that the statute bore that meaning as well. The petitioner argued that we should defer to that new approach. We would have none of it.

> "Were we, for argument's sake, to adopt petitioner's view that the Commission intended the commentary as an interpretation of §841(b)(1), and that the last sentence of the commentary states the Commission's view that the dose-based method is consistent with the term 'mixture or substance' in the statute, he still would not prevail. The Commission's dose-based method cannot be squared with *Chapman.* . . . In these circumstances, we need not decide what, if any, deference is owed the Commission in order to reject its alleged contrary interpretation. Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis,* and we assess an agency's later interpretation of the statute against that settled law." *Id.*, at 294–295 (citations omitted).

There is, in short, no way to avoid the ossification of federal law that today's opinion sets in motion. What a court says is the law after according *Skidmore* deference will be the

law forever, beyond the power of the agency to change even through rulemaking.

4

And finally, the majority's approach compounds the confusion it creates by breathing new life into the anachronism of *Skidmore,* which sets forth a sliding scale of deference owed an agency's interpretation of a statute that is dependent "upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"; in this way, the appropriate measure of deference will be accorded the "body of experience and informed judgment" that such interpretations often embody, 323 U. S., at 140. Justice Jackson's eloquence notwithstanding, the rule of. *Skidmore* deference is an empty truism and a trifling statement of the obvious: A judge should take into account the well-considered views of expert observers.

It was possible to live with the indeterminacy of *Skidmore* deference in earlier times. But in an era when federal statutory law administered by federal agencies is pervasive, and when the ambiguities (intended or unintended) that those statutes contain are innumerable, totality-of-the-circumstances *Skidmore* deference is a recipe for uncertainty, unpredictability, and endless litigation. To condemn a vast body of agency action to that regime (all except rulemaking, formal (and informal?) adjudication, and whatever else might now and then be included within today's intentionally vague formulation of affirmative congressional intent to "delegate") is irresponsible.

## II

The Court's pretense that today's opinion is nothing more than application of our prior case law does not withstand analysis. It is, to be sure, impossible to demonstrate that any of our cases contradicts the rule of decision that the

Court prescribes, because the Court prescribes none. More precisely, it at one and the same time (1) renders meaningless its newly announced requirement that there be an affirmative congressional intent to have ambiguities resolved by the administering agency, and (2) ensures that no prior decision can possibly be cited which contradicts that requirement, by simply announcing that all prior decisions according *Chevron* deference exemplify the multifarious ways in which that congressional intent can be manifested: "[A]s significant as notice-and-comment is in pointing to *Chevron* authority, the want of that procedure here does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded," *ante*, at 230–231.[4]

---

[4] As a sole, teasing example of those "sometimes" the Court cites *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.*, 513 U. S. 251 (1995), explaining in a footnote that our "longstanding precedent" evinced a tradition of great deference to the "'deliberative conclusions'" of the Comptroller of the Currency as to the meaning of the banking laws the Comptroller is charged with enforcing. *Ante*, at 231, n. 13. How it is that a tradition of great judicial deference to the agency head provides affirmative indication of congressional intent to delegate authority to resolve statutory ambiguities challenges the intellect and the imagination. If the point is that Congress must have been aware of that tradition of great deference when it enacted the law at issue, the same could be said of the Customs Service, and indeed of *all* agencies. See, *e. g.*, 4 K. Davis, Administrative Law Treatise § 30.08, pp. 237–238 (1958) (describing the "great weight" accorded the "determination[s]" of the Federal Trade Commission (quoting *FTC* v. *Cement Institute*, 333 U. S. 683, 720 (1948)); Report of the Attorney General's Committee on Administrative Procedure, S. Doc. No. 8, 77th Cong., 1st Sess., 90–91 (1941). Indeed, since our opinion in *Chevron* Congress must have been aware that we would defer to *all* authoritative agency resolutions of statutory ambiguities. Needless to say, *NationsBank* itself makes no mention of any such affirmative indication, because it was never the law. The many other cases that contradict the Court's new rule will presumably be explained, like *NationsBank*, as other "modes" of displaying affirmative congressional intent. If a tradition of judicial deference can be called that with a straight face, what cannot be?

The principles central to today's opinion have no antecedent in our jurisprudence. *Chevron*, the case that the opinion purportedly explicates, made no mention of the "relatively formal administrative procedure[s]," *ante*, at 230, that the Court today finds the best indication of an affirmative intent by Congress to have ambiguities resolved by the administering agency. Which is not so remarkable, since *Chevron* made no mention of any *need* to find such an affirmative intent; it said that in the event of statutory ambiguity agency authority to clarify was to be *presumed*. And our cases have followed that prescription.

Six years ago, we unanimously accorded *Chevron* deference to an interpretation of the National Bank Act, 12 U. S. C. § 24 Seventh (1988 ed. and Supp. V), contained in a letter to a private party from a Senior Deputy Comptroller of the Currency. See *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.*, 513 U. S. 251, 255, 257 (1995). We did so because the letter represented (and no one contested) that it set forth the official position of the Comptroller of the Currency, see *id.*, at 263.

Several cases decided virtually in the wake of *Chevron*, which the Court conveniently ignores, demonstrate that Congress could not (if it was reading our opinions) have acted in reliance on a background assumption that *Chevron* deference would generally be accorded only to agency interpretations arrived at through formal adjudication, notice-and-comment rulemaking, or other procedures assuring "fairness and deliberation," *ante*, at 230. In *FDIC* v. *Philadelphia Gear Corp.*, 476 U. S. 426, 438–439 (1986), we accorded *Chevron* deference to the Federal Deposit Insurance Corporation's interpretation of the statutory term "deposit" reflected in a course of unstructured administrative actions, and gave particular weight to the agency's "contemporaneous understanding" reflected in the response given by an FDIC official to a question asked at a meeting of FDIC and bank officials. It was clear that the position reflected

the official position of the agency, and that was enough to command *Chevron* deference. In *Young* v. *Community Nutrition Institute*, 476 U. S. 974 (1986), the statutory ambiguity at issue pertained to a provision that "the Secretary [of Health and Human Services] shall promulgate regulations limiting the quantity [of any poisonous or deleterious substance added to any food] to such extent as he finds necessary for the protection of public health." The Secretary had regularly interpreted the phrase "to such extent as he finds necessary" as conferring discretion not to issue a rule, rather than merely discretion regarding the quantity that the rule would permit. This interpretation was not, of course, reflected in any formal adjudication, and had not been the subject of any informal rulemaking—it was the Secretary's *understanding* consistently applied in the course of the Department's practice. We accorded it *Chevron* deference, as unquestionably we should have. And in *Mead Corp.* v. *Tilley*, 490 U. S. 714 (1989), a private suit by retirees against their former employer under the Employee Retirement Income Security Act of 1974 (ERISA), we accorded *Chevron* deference to the Pension Benefit Guaranty Corporation's interpretation of § 4044(a) of ERISA, 29 U. S. C. § 1344(a) (1982 ed. and Supp. V), that was reflected only in an *amicus* brief to this Court and in several opinion letters issued without benefit of any prescribed procedures. See 490 U. S., at 722.

I could continue to enumerate cases according *Chevron* deference to agency interpretations not arrived at through formal proceedings—for example, *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 642–643, 647–648 (1990) (according *Chevron* deference to the PBGC's interpretation of the requirements for its restoring a terminated plan under § 4047 of ERISA, 29 U. S. C. § 1347 (1988 ed.), which interpretation was reflected in nothing more than the agency's act of issuing a notice of restoration). Suffice it to say that many cases flatly contradict the theory of *Chevron* set forth in today's opinion, and *with one exception*

not a single case can be found with language that supports the theory. That exception, a very recent one, deserves extended discussion.

In *Christensen* v. *Harris County*, 529 U. S. 576 (2000), the Court said the following:

> "[W]e confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Id.*, at 587.

This statement was dictum, unnecessary to the Court's holding. Since the Court went on to find that the Secretary of Labor's position "ma[de] little sense" given the text and structure of the statute, *id.*, at 585–586, *Chevron* deference could not have been accorded *no matter what* the conditions for its application. See 529 U. S., at 591 (SCALIA, J., concurring in part and concurring in judgment). It was, moreover, dictum unsupported by the precedent that the Court cited.

The *Christensen* majority followed its above-quoted dictum with a string citation of three cases, none of which sustains its point. In *Reno* v. *Koray*, 515 U. S. 50 (1995), we had no occasion to consider what level of deference was owed the Bureau of Prisons' interpretation of 18 U. S. C. § 3585(b) set forth in an internal agency guideline, because our opinion made clear that we would have independently arrived at the same interpretation on our own, see 515 U. S., at 57–60. And although part of one sentence in *Koray* might be read to suggest that the Bureau's "Program Statemen[t]" should be accorded a measure of deference less than that mandated by *Chevron*, this aside is ultimately inconclusive,

since the sentence ends by observing that the statement was "a 'permissible construction of the statute'" under *Chevron*. 515 U. S., at 61 (quoting *Chevron*, 467 U. S., at 843). In the second case cited, *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244 (1991), it was again unnecessary to our holding whether the agency's interpretation of the statute warranted *Chevron* deference, since the "longstanding . . . 'canon of [statutory] construction'" disfavoring extraterritoriality, 499 U. S., at 248, would have required the same result even if *Chevron* applied. See 499 U. S., at 260 (SCALIA, J., concurring in part and concurring in judgment). While the opinion did purport to accord the Equal Employment Opportunity Commission's informally promulgated interpretation only *Skidmore* deference, it did so because the Court thought itself bound by its pre-*Chevron*, EEOC-specific decision in *General Elec. Co.* v. *Gilbert*, 429 U. S. 125 (1976), which noted that "'Congress, in enacting Title VII, did not'" intend to give the EEOC substantive authority to resolve statutory ambiguities, *Arabian American Oil, supra,* at 257 (quoting *Gilbert, supra,* at 141). Lastly, in *Martin* v. *Occupational Safety and Health Review Comm'n*, 499 U. S. 144 (1991), the question of the level of deference owed the Secretary of Labor's interpretation of the Occupational Safety and Health Act of 1970, 84 Stat. 1590, as amended, 29 U. S. C. § 651 *et seq.*, was neither presented by the case nor considered in our opinion. The only question before the Court was which of two competing interpretations of 29 CFR § 1910.1029 (1990)—the Secretary's or the Occupational Safety and Health Review Commission's—should have been deferred to by the court below. See 499 U. S., at 150. The dicta the *Christensen* Court cited, 529 U. S., at 587 (citing 499 U. S., at 157), opined on the measure of deference owed the Secretary's interpretation, not of the statute, but of his own regulations, see generally Manning, Constitutional Structure

and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L. Rev. 612 (1996).

To make matters worse, the arguments marshaled by *Christensen* in support of its dictum—its observation that "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all . . . lack the force of law," and its citation of 1 K. Davis & R. Pierce, Administrative Law Treatise § 3.5 (3d ed. 1994), 529 U. S., at 587—are not only unpersuasive but bear scant resemblance to the reasoning of today's opinion. Davis and Pierce, and Professor Robert Anthony upon whom they rely, see Anthony, Which Agency Interpretations Should Bind Citizens and the Courts?, 7 Yale J. on Reg. 1 (1990), do indeed set forth the argument I have criticized above, that congressional authorization of informal rulemaking or formal (and perhaps even informal) adjudication somehow bespeaks a congressional intent to "delegate" power to resolve statutory ambiguities. But their analysis does not permit the broad add-ons that the Court's opinion contains—"some other [procedure] indicati[ng] comparable congressional intent," *ante*, at 227, and "we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded," *ante*, at 231.

## III

To decide the present case, I would adhere to the original formulation of *Chevron*. " 'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress,' " 467 U. S., at 843 (quoting *Morton* v. *Ruiz*, 415 U. S. 199, 231 (1974)). We accordingly presume—and our precedents have made clear to Congress that we presume— that, absent some clear textual indication to the contrary, "Congress, when it left ambiguity in a statute meant for im-

plementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows," *Smiley*, 517 U. S., at 740–741 (citing *Chevron, supra*, at 843–844). *Chevron* sets forth an across-the-board presumption, which operates as a background rule of law against which Congress legislates: Ambiguity means Congress intended agency discretion. Any resolution of the ambiguity by the administering agency that is authoritative—that represents the official position of the agency—must be accepted by the courts if it is reasonable.

Nothing in the statute at issue here displays an intent to modify the background presumption on which *Chevron* deference is based. The Court points, *ante*, at 233, n. 16, to 28 U. S. C. § 2640(a), which provides that, in reviewing the ruling by the Customs Service, the Court of International Trade (CIT) "shall make its determinations upon the basis of the record made before the court." But records are made to determine the facts, not the law. All this provision means is that new evidence may be introduced at the CIT stage; it says nothing about whether the CIT must respect the Customs Service's authoritative interpretation of the law. More significant than § 2640(a), insofar as the CIT's obligation to defer to the Customs Service's legal interpretations is concerned, is § 2639(a)(1), which requires the CIT to accord a "presum[ption of] correct[ness]" to the Customs Service's decision. Another provision cited by the Court, *ante*, at 233, n. 16, is § 2638, which provides that the CIT, "by rule, may consider any new ground in support" of the challenge to the Customs Service's ruling. Once again, it is impossible to see how this has any connection to the degree of deference the CIT must accord the Customs Service's interpretation of its statute. Such "new ground[s]" may be intervening or newly discovered facts, or some intervening

law or regulation that might render the Customs Service's ruling unsound.[5]

There is no doubt that the Customs Service's interpretation represents the authoritative view of the agency. Although the actual ruling letter was signed by only the Director of the Commercial Rulings Branch of Customs Headquarters' Office of Regulations and Rulings, see Pet. for Cert. 47a, the Solicitor General of the United States has filed a brief, cosigned by the General Counsel of the Department of the Treasury, that represents the position set forth in the ruling letter to be the official position of the Customs Service. Cf. *Christensen*, 529 U. S., at 591 (SCALIA, J., concurring in part and concurring in judgment). No one contends that it is merely a *"post hoc* rationalizatio[n]" or an "agency litigating positio[n] wholly unsupported by regulations, rulings, or administrative practice," *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 212 (1988).[6]

---

[5] The Court also states that "[i]t is hard to imagine" that Congress would have intended courts to defer to classification rulings since "the scheme for CIT review includes a provision that treats classification rulings on par with the Secretary's rulings on 'valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters,'" *ante*, at 232–233 (quoting 28 U. S. C. § 1581(h), and citing § 2639(b)). I fail to see why this is hard to imagine at all. If anything, the fact that "the scheme for CIT review . . . treats classification rulings on par with the Secretary's rulings on" such important matters as "'valuation, rate of duty, . . . restricted merchandise [and] entry requirements,'" *ante*, at 232–233, which often require interpretation of the Nation's customs and tariff statutes, only strengthens the case for according *Chevron* deference to whatever statutory interpretations (as opposed to factual determinations) such rulings embody. In other words, the Court's point is wrong—indeed, the Court's point cuts deeply into its own case—unless the Court believes that the Secretary's *personal* rulings on the legal criteria for imposing particular rates of duty, or for determining restricted merchandise, are entitled to no deference.

[6] The Court's parting shot, that "there would have to be something wrong with a standard that accorded the status of substantive law to every one of 10,000 'official' customs classifications rulings turned out each year from over 46 offices placed around the country at the Nation's entryways," *ante*, at 238, n. 19, misses the mark. I do not disagree. The

There is also no doubt that the Customs Service's interpretation is a reasonable one, whether or not judges would consider it the best.  I will not belabor this point, since the Court evidently agrees: An interpretation that was unreasonable would not merit the remand that the Court decrees for consideration of *Skidmore* deference.

## IV

Finally, and least importantly, even were I to accept the Court's revised version of *Chevron* as a correct statement

---

"authoritativeness" of an agency interpretation does not turn upon whether it has been enunciated by someone who is actually employed by the agency.  It must represent the judgment of central agency management, approved at the highest levels.  I would find that condition to have been satisfied when, a ruling having been attacked in court, the general counsel of the agency has determined that it should be defended. If one thinks that that does not impart sufficient authoritativeness, then surely the line has been crossed when, as here, the General Counsel of the agency and the Solicitor General of the United States have assured this Court that the position represents the agency's authoritative view. (Contrary to the Court's suggestion, there would be nothing bizarre about the fact that this latter approach would entitle the ruling to deference here, though it would not have been entitled to deference in the lower courts.  Affirmation of the official agency position before this court—if that is thought necessary—is no different from the agency's issuing a new rule after the Court of Appeals determination.  It establishes a new legal basis for the decision, which this Court must take into account (or remand for that purpose), even though the Court of Appeals could not. See *Thorpe* v. *Housing Authority of Durham*, 393 U. S. 268, 282 (1969); see also *United States* v. *Schooner Peggy*, 1 Cranch 103 (1801).)

The *authoritativeness* of the agency ruling may not be a bright-line standard—but it is infinitely brighter than the line the Court asks us to draw today, between a statute such as the one at issue in *NationsBank* that (according to the Court) *does* display an "affirmative intent" to "delegate" interpretive authority, and innumerable indistinguishable statutes that (according to the Court) do *not*.  And, most important of all, it is a line that focuses attention on the right question: not whether Congress "affirmatively intended" to delegate interpretive authority (if it entrusted administration of the statute to an agency, it did, because that is how our system works); but whether it is truly the agency's considered view, or just the opinions of some underlings, that are at issue.

of the law, I would still accord deference to the tariff classification ruling at issue in this case. For the case is indistinguishable, in that regard, from *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.*, 513 U. S. 251 (1995), which the Court acknowledges as an instance in which *Chevron* deference is warranted notwithstanding the absence of formal adjudication, notice-and-comment rulemaking, or comparable "administrative formality," *ante*, at 231. Here, as in *NationsBank*, there is a tradition of great deference to the opinions of the agency head, *ante*, at 231, n. 13. Just two Terms ago, we observed:

> "As early as 1809, Chief Justice Marshall noted in a customs case that '[i]f the question had been doubtful, the court would have respected the uniform construction which it is understood has been given by the treasury department of the United States upon similar questions.' *United States* v. *Vowell*, 5 Cranch 368, 372. See also P. Reed, The Role of Federal Courts in U. S. Customs & International Trade Law 289 (1997) ('Consistent with the *Chevron* methodology, and as has long been the rule in customs cases, customs regulations are sustained if they represent reasonable interpretations of the statute'); cf. *Zenith Radio Corp.* v. *United States*, 437 U. S. 443, 450 (1978) (deferring to the Treasury Department's 'longstanding and consistent administrative interpretation' of the countervailing duty provision of the Tariff Act." *United States* v. *Haggar Apparel Co.*, 526 U. S. 380, 393 (1999).

And here, as in *NationsBank*, the agency interpretation in question is officially that of the agency head. Consequently, even on the Court's own terms, the Customs ruling at issue in this case should be given *Chevron* deference.

\*　　\*　　\*

For the reasons stated, I respectfully dissent from the Court's judgment. I would uphold the Customs Service's construction of Subheading 4820.10.20 of the Harmonized Tariff Schedule of the United States, 19 U. S. C. § 1202, and would reverse the contrary decision of the Court of Appeals. I dissent even more vigorously from the reasoning that produces the Court's judgment, and that makes today's decision one of the most significant opinions ever rendered by the Court dealing with the judicial review of administrative action. Its consequences will be enormous, and almost uniformly bad.