SPRINGFIELD, INC., Appellant

v.

Bradley A. BUCKLES, Director, Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, Appellee

No. 00–5409.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 3, 2001.

Decided June 14, 2002.

Rehearing and Rehearing En Banc Denied Aug. 8, 2002.

Stephen P. Halbrook argued the cause for appellant. With him on the briefs was Richard E. Gardiner.

Michael S. Raab, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Roscoe C. Howard, Jr., U.S. Attorney, and Mark B. Stern, Attorney, U.S. Department of Justice.

Stuart J. Land, Robert S. Litt and Robert J. Katerberg were on the brief for amicus curiae The Brady Center to Prevent Gun Violence, et al.

Before: GINSBURG, Chief Judge, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

█ The Secretary of the Treasury must authorize the importation of any firearm that is "of a type" "generally recognized as particularly suitable for or readily adaptable to sporting purposes." 18 U.S.C. § 925(d)(3). In April 1998, the Secretary announced that modified semiautomatic assault rifles with the ability to accept large capacity military magazines do not satisfy § 925(d)(3), and therefore may not be imported pursuant to that section. As a result, the Bureau of Alcohol, Tobacco and Firearms, an agency within the Treasury Department, revoked import permits held by Springfield, Inc., for two makes of rifles and denied Springfield's import applications. The company sued the Director of BATF for an order compelling issuance of the permits. The district court granted summary judgment against Springfield.

## I.

█ The Gun Control Act of 1968 vests the Treasury Secretary with authority to regulate the importation of firearms. The Secretary has delegated his authority to the Director of BATF. *See* 18 U.S.C. § 922(a)(1); Treas. Dep't Order No. 120–01 (June 6, 1972). Aside from "curios" or "relics," *see* 18 U.S.C. § 925(e), no firearm may be imported unless it:

(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to [firearms programs of the U.S. Army, 10 U.S.C. § 4301 *et seq.*];

(2) is an unserviceable firearm, other than a machinegun as defined in [26 U.S.C. § 5845(a)] (not readily restorable to firing condition), imported or brought in as a curio or museum piece;

(3) is of a type that does not fall within the definition of a firearm as defined in [26 U.S.C. § 5845(a)] and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms, except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled; or

(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm or ammunition.

18 U.S.C. § 925(d).

A BATF study in 1989 identified several characteristics of the modern military as-

sault rifle. These included the ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights. REPORT AND RECOMMENDATION OF THE ATF WORKING GROUP ON THE IMPORTABILITY OF CERTAIN SEMIAUTOMATIC RIFLES 6–8 (1989) [hereinafter ATF WORKING GROUP]. As to detachable magazines, the agency reported that

> Virtually all modern military firearms are designed to accept large, detachable magazines. This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity. In addition, some States have a limit on the magazine capacity allowed for hunting, usually 8 rounds or less. That a firearm is designed and sold with a large capacity magazine, *e.g.,* 20–30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle.

*Id.* at 6–7. After the 1989 study, BATF took the position that a rifle with any of these military configurations, other than the ability to accept a large magazine, failed the sporting purpose test of § 925(d)(3). *See* DEPARTMENT OF TREASURY STUDY ON THE SPORTING SUITABILITY OF MODIFIED SEMIAUTOMATIC ASSAULT RIFLES 11 (1998) [hereinafter TREASURY DEPARTMENT STUDY]. Manufacturers responded by modifying their weapons to remove these seven military features.

From 1989 through 1997, BATF permitted Springfield to import rifles known as the "SAR8 Sporter" and the "SAR4800 Sporter" (and other slightly-altered versions of these two rifles with, for example, longer barrels). The SAR8 Sporter is a modified version of an assault rifle produced by a German firearms manufacturer, Heckler & Koch. The SAR4800 Sporter is a modified version of the FN–FAL, a Belgian weapon.[1] Both of Springfield's rifles have the ability to accept large, military-style magazines.

In 1997, a group of Senators complained to the President about the importation of "military-style assault weapons" such as modified versions of the Israeli-made Uzi. At the direction of the President, BATF temporarily suspended all import licenses for "modified semiautomatic assault-type rifles," including Springfield's. In a study completed six months later, the Treasury Department concluded that rifles which can accept large capacity, detachable magazines—those containing more than 10 bullets—are not firearms "generally recognized as particularly suitable for or readily adaptable to sporting purposes" within § 925(d)(3). *See generally* TREASURY DEPARTMENT STUDY.

BATF notified Springfield by letter that it proposed to suspend the company's import permits for the SAR8 and the SAR4800 on the ground that these firearms did not qualify under § 925(d)(3), citing the study. Springfield responded by reminding BATF of its earlier decision—made in 1989—to permit importation of Springfield's rifles. The company saw no reason for a different conclusion nine years later and urged a return to the prior decision. Without supplying any fresh information, Springfield argued that the "ability to accept a large capacity military magazine is also the ability to accept a small capacity non-military magazine" and that "[s]ome shooting sports require a

---

**1.** The basis for BATF granting import permits to Springfield for these rifles (*e.g.,* what particular sporting purposes were involved) is not clear from the record.

large capacity magazine and some require a small capacity magazine."

In January 1999, the BATF Director issued his final judgment rejecting Springfield's administrative "appeal" and suspending its import licenses. The Director rejected the idea that the rifles had a sporting purpose because no military would use them in combat and because the rifles could be used for target shooting or hunting. Citing the 1998 study, the Director pointed out that criminals often use such rifles. The Director also reiterated that it is the ability to accept a large capacity magazine, not the size of the magazine actually used, which prevents the Springfield rifles from being generally recognized as having a sporting purpose. The Director refused to infer a sporting purpose for the Springfield firearms from the fact that Congress—when it passed the 1994 assault weapons ban, 18 U.S.C. § 922(v)—did not completely ban a similar weapon. Finally, the Director pointed out that the company provided no evidence to support its assertion that some shooting sports require a large capacity magazine.

For the most part, the BATF Director adhered to the interpretation of § 925(d)(3) comprehensively set forth in a 1989 Director's decision revoking the importation permits of Mitchell Arms, Inc. The 1989 decision described the agency's view of § 925(d)(3) thus:[2] "In over 20 years of administering this provision, ATF has interpreted the phrase 'particularly suitable for or readily adaptable to' as a unit. The phrase has not been dissected and the terms given separate application or meaning. Reading the phrase as a whole gives effect to the congressional intent that only genuine sporting rifles be imported." Mitchell Arms, Inc., Decision of the Director Revoking Import Permits

and Denying Applications for Import Permits 31 (Bureau of Alcohol, Tobacco & Firearms Nov. 6, 1989). As to the words "readily adaptable to sporting purposes," the 1989 decision rejected the idea that a firearm would qualify so long as it could be modified to allow its use for activities such as hunting. Such an interpretation "would allow the importation of virtually any and all rifles without distinction.... As Congress could not sensibly have sought to make a firearm importable based on changes that theoretically could be made *after* importation, the phrase 'generally recognized as particularly suitable for or readily adaptable to sporting purposes' must refer to the characteristics of the firearm that exist at the time of importation." *Id.* The 1989 decision also rejected the argument that "sporting purposes," as used in § 925(d)(3), included "every conceivable type of activity or competition which might include a firearm. Otherwise, a 'sporting purpose' could be advanced for every firearm sought to be imported." *Id.* at 22.

This BATF reading of § 925(d)(3) has remained constant. The views expressed in the Director's 1989 decision were also preceded by an agency study of assault weapons. *See generally* ATF WORKING GROUP. The 1998 study, and the Director's reasoning in support of his revocation of Springfield's permits, reflect the agency's earlier construction of § 925(d)(3). What changed as a result of the 1998 study, and in the Director's decision in this case, is not so much the agency's view of the statute, but its application of an interpretation it had long followed.

## II.

We will not spend much time dealing with the question raised by *United States*

---

**2.** This decision was the subject of a Takings Clause claim rejected by the United States Claims Court and the Federal Circuit. *See*

*Mitchell Arms, Inc. v. United States,* 26 Cl.Ct. 1, 3 (1992), *aff'd,* 7 F.3d 212 (Fed.Cir.1993).

*v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)—namely, whether *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and its requirement of judicial deference to reasonable agency interpretations of statutes, applies to informal adjudications of the sort we have in this case.[3] Whether we follow *Chevron* or simply review the Director's statutory construction on the basis of *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), *see Am. Fed'n of Gov't Employees v. Veneman*, 284 F.3d 125, 129 (D.C.Cir.2002), is of no moment. The persuasiveness of the agency's reasoning, in both the Director's 1989 and 1999 decisions, the application of BATF's expertise, and the lack of evidence to support Springfield's assertions, lead us to the same result under either line of authority.

■■■ Springfield's first contention is that even if its rifles are not "particularly suitable for" "sporting purposes," they are "readily adaptable to" that end because they can accept small magazines. But § 925(d)(3) also requires that the firearm be "generally recognized" as one used in sport. BATF's view, ever since the statute became law three decades ago, has been to treat the words of § 925(d)(3) as a whole and to view the alternative elements—"particularly suitable" or "readily adaptable" as interrelated. In other words, there must be general recognition that the particular firearm is adaptable to sport. Springfield presented no evidence to the Director that its rifles, designed to hold large, military magazines, are nonetheless "generally recognized" as adaptable to sporting purposes. Although the company asserted that its rifles had no use other than sport, the Director pointed out that such rifles had increasingly been used in the commission of violent crimes.[4]

■■■ Springfield also complains that BATF construed "sporting purposes" too narrowly, excluding "various forms of competitions, informal target shooting, plinking, and recreation." Brief for Appellant at 20. "The Act makes clear," the company also tells us, "that competitions in general, including with semiautomatic military rifles, are sporting purposes." *Id.* at 18. We see nothing so clear in the statute. Congress did not define "sporting purposes." The consistent position of BATF has been that § 925(d)(3) comprehends only particular uses of a firearm that have "attained general recognition as having a 'sporting purpose,'" *Gilbert Equip. Co. v. Higgins*, 709 F.Supp. 1071, 1075 (S.D. Ala. 1989), and only activities that are traditional sports. Otherwise, the prospect of using a firearm to shoot at bottles in the backyard or tin cans in the woods would

---

3. Cf. *FEC v. Nat'l Rifle Ass'n of Am.*, 254 F.3d 173, 184–86 (D.C.Cir.2001) (granting *Chevron* deference to interpretations in FEC advisory opinions); *In re Sealed Case*, 223 F.3d 775, 780 (D.C.Cir.2000) (*Chevron* deference for interpretations in FEC's no-action decision). *Compare Navajo Nation v. Dep't of Health & Human Servs.*, 285 F.3d 864, 871 (9th Cir. 2002) (*Chevron* deference to interpretation in letter denying application); *Pesquera Mares Australes, Ltda. v. United States*, 266 F.3d 1372, 1379–82 (Fed.Cir.2001) (*Chevron* deference to interpretation made during antidumping investigation); *American Wildlands v. Browner*, 260 F.3d 1192, 1195 (10th Cir.2001) (*Chevron* deference to interpretation expressed in EPA letter), *with Hall v. EPA*, 273 F.3d 1146, 1155–56 (9th Cir.2001) (denying *Chevron* deference to interpretation in EPA's approval of a revised air quality plan); *U.S. Freightways Corp. v. Comm'r of Internal Revenue*, 270 F.3d 1137, 1141–42 (7th Cir.2001) (declining to defer to interpretation of tax code in IRS audit).

4. The 1998 study reported an increase in the criminal use of rifles with large capacity magazines. In 1991, police submitted trace requests for only seven such rifles. In 1997, there were 1,024 trace requests for such rifles. TREASURY DEPARTMENT STUDY 33.

qualify it for importation, which of course would mean that all firearms must be allowed into the country. Such "plinking" therefore has long been considered "primarily a pastime," not a sport within § 925(d)(3)'s meaning. *See, e.g.,* TREASURY DEPARTMENT STUDY Ex. 6, reprinting the 1968 report of the meeting of the Firearms Advisory Panel; ATF WORKING GROUP 9–11. We find BATF's interpretation of "sporting purposes," in this respect, to be persuasive.[5]

■ Springfield also believes its rifles are used for "sporting purposes" in "practical shooting" events. Practical shooting, according to BATF, "involves moving, identifying, and engaging multiple targets and delivering a number of shots rapidly. In doing this, practical shooting participants test their defensive skills as they encounter props, including walls and barricades, with full or partial targets, 'no-shoots,' steel reaction targets, movers, and others to challenge them." TREASURY DEPARTMENT STUDY 17 n.48. BATF analogized these events to a "police/combat-style competition" which has never been considered a sporting purpose. *See Gilbert Equip. Co.,* 709 F.Supp. at 1075–76, 1077. Springfield provided no information about practical shooting to BATF. Its submission to the agency in response to the proposed revocation of its permits did not even mention the activity. While it may be that "sporting purpose" is not a static concept, *see Gun South, Inc. v. Brady,* 877 F.2d 858, 864 (11th Cir.1989), particularly in view of the "generally recognized" requirement, neither BATF nor this court have received any information demonstrating that a rifle must accept large magazines of ammunition if it is to be used at a practical shooting competition. Nor has Springfield demonstrated that its rifles, as currently designed, are "generally recognized" as "particularly suitable for or readily adaptable to" practical shooting.[6]

■ Springfield's final point is that it was arbitrary and capricious for BATF to bar importation of firearms it had in the past allowed to be imported. But agency views may change. *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970). We said earlier that the record contains no information indicating why BATF had thought that Springfield's two rifles satisfied § 925(d)(3). *See supra* note 1. All we know is that from 1989 to 1997, when the temporary ban took effect, a rifle's ability to accept a large, military-style magazine did not automatically disqualify it for importation. BATF fully explained why it has now decided that this particular military feature found in Springfield's rifles is of considerable significance. The courts may require only "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Id.; see. also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct.

---

**5.** Under the federal Sentencing Guidelines, the prison term for a felon who possesses a firearm, in violation of 18 U.S.C. § 922(g)(1), may be reduced if the weapon was "solely for lawful sporting purposes." U.S. SENTENCING GUIDELINES § 2K2.1(b)(2) (2001). The Third Circuit held that a defendant possessing guns solely for plinking "at cans, bottles, and the like in trash dumps or as they were floating by in a river," meets this standard. *United States v. Bossinger,* 12 F.3d 28, 29 (3d Cir. 1993). The *Bossinger* decision does not interpret § 925(d)(3) and the Sentencing Guidelines do not contain the qualifier "generally recognized" found in the provision before us.

**6.** Springfield argues that because § 925(d)(3) bars the importation of "surplus military firearms" for "sporting purposes," BATF can grant permits for the importation of military firearms which are not "surplus." Brief for Appellant at 23. This is true, but not sufficient to reverse the agency. Springfield's rifles must still be "of a type that" "is generally recognized as particularly suitable for or readily adaptable to sporting purposes."

2856, 2873, 77 L.Ed.2d 443 (1983); *Am. Trucking Ass'ns v. Atchison, Topeka & Santa Fe Ry.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). The BATF Director's decision revoking Springfield's permits met that standard.[7]

*Affirmed.*

---

**7.** We have considered and rejected Springfield's other arguments. They occasion no need for a written opinion. *See* D.C.Cir. R. 36(b).