**LUIGI BORMIOLI CORP., INC.,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 01–1166.**

United States Court of Appeals,
Federal Circuit.

Sept. 13, 2002.

Sandra Liss Friedman, Barnes, Richardson & Colburn, of New York, NY, argued for plaintiff-appellant. With him on the brief were Frederic D. Van Arnan, Jr. and Joseph M. Spraragen.

Amy M. Rubin, Attorney, Civil Division, Commercial Litigation Branch, International Trade Field Office, Department of Justice, of New York, NY, argued for defendant-appellee. With her on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; of Washington, DC; and Joseph I. Liebman, former Attorney in Charge, International Trade Field Office. Of counsel on the brief was Chi S. Choy, Office of Assistant Chief Counsel, United States Customs Service, of New York, NY.

Before CLEVENGER, Circuit Judge, ARCHER, Senior Circuit Judge, and DYK, Circuit Judge.

ARCHER, Senior Circuit Judge.

Luigi Bormioli Corp. ("Bormioli") appeals the judgment of the United States Court of International Trade granting summary judgment to the United States that the appraised transaction value of certain entries of Bormioli's imported glassware includes a charge of 1.25 percent of its invoice price. *See Luigi Bormioli Corp. v. United States,* 118 F.Supp.2d 1345 (C.I.T.2000). The court held that Bormioli did not demonstrate that the 1.25 percent charge was a *bona fide* interest charge excludable from the transaction value of the merchandise pursuant to *Treatment of Interest Charges in the Customs Value of Imported Merchandise,* 19 Cust. B. & Dec. 258 (1985), 50 Fed. Reg. 27,886 (July 8, 1985) ("TD 85–111"). Because we agree with the Court of International Trade that the United States Customs Service ("Customs") correctly determined that Bormioli did not demonstrate that the 1.25 percent charge should be excluded from transaction value, we affirm.

*Factual Background*

This case arises from certain favorable payment terms extended to Bormioli by its Italian parent company, Luigi Bormioli S.p.A. ("Bormioli Italy"). Bormioli im-

ports into the United States glassware it purchases from Bormioli Italy. Typically, Bormioli Italy requires payment from its customers within 60 days of the date of its invoice for the subject merchandise. However, in a January 8, 1987 letter, Bormioli Italy granted Bormioli an extension of the payment deadline from 60 to 180 days.

Under the terms of the agreement, if Bormioli elected to delay payment to Bormioli Italy beyond the normal 60-day deadline, Bormioli would be required to pay interest on the balance to Bormioli Italy at the then-prevailing Italian prime rate. Bormioli was required to make any such interest payments to Bormioli Italy at the end of each quarter. Of course, Bormioli still was required to pay the principal balance on the merchandise to Bormioli Italy within 180 days of the invoice.

Over time, Bormioli Italy reduced the term of the payment extensions. In a December 11, 1987 letter, Bormioli Italy shortened the payment deadline to 120 days effective January 1, 1988, and in a June 8, 1989 letter, it further shortened the payment deadline to 90 days effective August 1, 1989. The remainder of the terms of the original letter were unchanged. Bormioli states that these decreases in the length of the payment extensions reflected its increasing financial viability.

The glassware merchandise entries at issue in this case were imported in 1996, when the 90-day payment deadline was in effect. Using a "corporate charge invoice," Bormioli Italy billed Bormioli a 15 percent annual interest charge (1.25 percent per month) for delayed payment of one month (i.e., the difference between 90 and 60 days) for the imported merchandise. Bormioli recorded the charges in its books as "corporate charges," denominated "special [payment] terms 15% interest charges." Bormioli Italy's invoices to Bormioli for the glassware itself did not include an "interest" listing for the subject charges.

In practice, Bormioli's payment of these "interest" charges deviated from the terms of its letter agreement with Bormioli Italy in several ways. First, Bormioli made payments on six to twelve months worth of accrued charges, rather than quarterly. Second, Bormioli made the payments on the basis of a 15 percent interest rate (1.25 percent per month), rather than the roughly 11.1 percent prime rate in effect in Italy in 1996. Finally, it frequently paid the outstanding invoices after the 90-day deadline (up to 22 days later).

In 1996, Customs appraised the Bormioli imported merchandise on the basis of transaction value pursuant to 19 U.S.C. § 1401a(b). It determined that the value of the goods was the invoice price, plus an additional 1.25 percent of the invoice price based on the payments Bormioli made to Bormioli Italy. Customs made this determination based on its policy set forth in TD 85-111, which provides in relevant part:

[I]nterest payments, whether or not included in the price actually paid or payable for merchandise, should not be considered part of dutiable value provided the following criteria are satisfied:

I. The interest charges are identified separately from the price actually paid or payable for the goods;

II. The financing arrangement in question was made in writing;

III. Where required by Customs, the buyer can demonstrate that

—The goods undergoing appraisement are actually sold at the price declared as the price paid or payable, and

—The claimed rate of interest does not exceed the level for such transaction prevailing in the country where, and

at the time, when the financing was provided.

TD 85–111. The criteria in paragraph "C" are considered satisfied if the claimed charges for interest and principal are "consistent with those usually reflected in sales of identical or similar merchandise." *Id.*

Bormioli filed suit in the Court of International Trade to challenge the inclusion of the 1.25 percent charge. Bormioli argued that TD 85–111 did not "apply" to its interest payments, or, alternatively, that its payments satisfied TD 85–111's test for excludable interest. On cross-motions for summary judgment, Bormioli submitted evidence that the invoice price of the goods sold in the U.S. was the same, or within five cents, of the price of similar goods it sold in Canada. It further presented evidence that in June 1996, the Internal Revenue Service referred to the subject charges as interest charges paid to a foreign corporation, and required Bormioli to withhold United States tax on the payments.

The Court of International Trade granted summary judgment to the United States. Citing *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), the court refused to grant *Chevron* deference, or any deference, to TD 85–111, and instead performed a *de novo* review. The court nonetheless found that TD 85–111 was consistent with the 19 U.S.C. § 1401a statutory scheme, as well as with the decision on the treatment of interest reached by the Committee on Customs Valuation of the General Agreement on Tariffs and Trade ("GATT"). Therefore, the court applied the three TD 85–111 factors to Bormioli. It held that Bormioli met only the first because (1) Bormioli departed from the terms of the written agreement; (2) the Canadian transactions are irrelevant because only U.S. transactions may be used as a comparison; and (3) the interest rate was not comparable to that prevailing in Italy.

## Discussion

■ We review a grant of summary judgment by the Court of International Trade *de novo. Int'l Light Metals v. United States*, 194 F.3d 1355, 1361 (Fed.Cir. 1999). Statutory interpretation is a matter of law that we review without deference to the interpretation reached by the Court of International Trade. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1378 (Fed.Cir.2001).

We need not reach the issue of the level of deference owed to Customs' treatment of interest as set forth in TD 85–111. The government argues that TD 85–111 should receive deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), while Bormioli argues that no deference is due. In *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), a decision issued after briefing in this case, the Supreme Court held that an agency's statutory interpretations are due *Chevron* deference when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 226–27, 121 S.Ct. 2164. The Court further made clear that even where an agency's interpretation is not entitled to *Chevron* deference, it may be entitled to some deference based on its "power to persuade" in accordance with the principles of *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *Mead*, 533 U.S. at 228, 235, 121 S.Ct. 2164 (noting "the merit of its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight."). We need

not determine whether Chevron, Skidmore, or any deference is applicable to TD 85–111, because, as more fully discussed below, we agree with the Court of International Trade that the meaning of TD 85–111 reflects a proper interpretation of 19 U.S.C. § 1401a based on our *de novo* consideration of the issue. *See Thai Pineapple Canning Indus. Corp. v. United States,* 273 F.3d 1077, 1083 (Fed.Cir.2001) (declining to decide whether *Chevron* or *Skidmore* deference applied to policy where the distinction is of no moment to the case); *see also Springfield, Inc. v. Buckles,* 292 F.3d 813, 2002 WL 1300022 at *4 (D.C.Cir.2002) (declining to resolve level of deference).

## I.

We begin by a review of the statutory framework. In 1979, the parties to the GATT agreed to a comprehensive Customs Valuation Code. The Code established that the preferred method of calculating the appraised value of imported merchandise would be "transaction value," based on the "price actually paid or payable" for the merchandise. *See* General Agreement on Tariffs and Trade, *opened for signature,* Oct. 30, 1947, Art. i, vii, viii, 61 Stat. (pts. 5 & 6) A3, 55 U.N.T.S. 187, 196–200, 216–200; *see also* Agreement on Implementation of Article VII of the General Agreement on Tariffs and Trade, Apr. 12, 1979, T.I.A.S. No. 10,402 (hereinafter "GATT Valuation Code"); Michael E. Roll., Comment, *Nissho Iwai American Corp. v. United States: Customs Appraisement and Middleman Pricing under Section 402 of the Tariff Act of 1930,* 17 Fordham Int'l L.J. 190, 199–200 (1993).

The United States adopted the transaction valuation method of appraisal in 19 U.S.C. § 1401a(b) (codifying section 402(b) of the Trade Agreements Act of 1930, amended by the Trade Agreements Act of 1979). Paragraph (b)(1) of that section provides: "The transaction value of imported merchandise is *the price actually paid or payable for the merchandise* when sold for exportation to the United States, plus [certain additional] amounts . . ." 19 U.S.C. § 1401a(b)(1) (1994) (emphasis added).[1] These additional amounts (set forth in sub-paragraphs (A)-(E) of the statute) are to be added to the "price actually paid or payable" only if they are not otherwise included in that price, and if they are based on sufficient information. *Id.* Congress also expressly excluded certain charges from transaction value (such as certain taxes and post-importation costs).[2]

---

1. These additional amounts are

 (A) the packing costs incurred by the buyer with respect to the imported merchandise;

 (B) any selling commission incurred by the buyer with respect to the imported merchandise;

 (C) the value, apportioned as appropriate, of any assist;

 (D) any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States; and

 (E) the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller.
 19 U.S.C. § 1401a(b)(1) (1994).

2. These excluded charges are

 (A) Any reasonable cost or charge that is incurred for—

 (i) the construction, erection, assembly, or maintenance of, or the technical assistant provided with respect to, the merchandise after its importation into the United States; or

 (ii) the transportation of the merchandise after such importation.

 (B) The customs duties and other Federal taxes currently payable on the imported merchandise by reason of its importation,

Section 1401a(b)(3) specifies that these enumerated excluded costs are not included in transaction value if they are identified separately from the "price actually paid or payable" and from any cost or other item referred to in section (b)(1). 19 U.S.C. § 1401a(b)(3) (1994).

"Interest" is not one of the specifically statutorily mandated inclusions or one of the exclusions. Nonetheless, Congress provided a flexible definition for the "price actually paid or payable":

> The term "price actually paid or payable" means *the total payment* (whether direct or indirect, and exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States) *made, or to be made, for imported merchandise* by the buyer to, or for the benefit of, the seller.

19 U.S.C. § 1401a(b)(4)(A) (emphases added). We have interpreted the term "total payment" in the "price actually paid or payable" definition to be "all-inclusive." *Generra Sportswear Co. v. United States,* 905 F.2d 377, 379 (Fed.Cir.1990). Therefore, we have held that the "price actually paid or payable" includes payments made by the buyer to the seller in exchange for merchandise even if the payment "represents something other than the *per se* value of the goods." *Id.* at 379–80 (holding that quota payments were properly included in the "price actually paid or payable").

This interpretation is consistent with the broad definition of "price actually paid or payable" adopted by the GATT.[3]

Within this framework, Customs issued a series of interpretive rulings expressly addressing the question of when it would consider interest payments to be part of the "price actually paid or payable" for merchandise, and hence part of the transaction value. *See* TAA No. 14, 542150 MK (January 6, 1981) (hereinafter "TAA 14"); TAA No. 31, 542275 TLL (June 11, 1981) (hereinafter "TAA 31"); and TAA No. 43, HQ 542627, 16 Cust. B. & D. 866 (December 17, 1981) (hereinafter "TAA 43"). In these rulings, Customs stated that only those interest payments which were part of an "overall financing arrangement" (TAA 43), or those which were paid by a buyer to a third party unrelated to a seller and which did not accrue to the seller's benefit (TAA 31) were not dutiable. *See* TD 85–111; TAA 43; TAA 31. For example, in TAA 43, Customs considered a financing arrangement that allowed an importer to delay paying its supplier for merchandise on the condition that it paid its supplier interest for the period of the delay. Customs found that because (1) the proposed financial relationship bore "no relationship to the particular sale," (2) the supplier had the right to renegotiate the interest rate if the going rate changed sufficiently, and (3) the financing arrangement was "fully documented as being separate from the import transaction," Customs would not consider the interest payments to be part of "the price actually paid or payable" for

and any Federal excise tax on, or measured by the value of, such merchandise for which vendors in the United States are ordinarily liable.
19 U.S.C. § 1401a(b)(3) (1994).

3. "The price actually paid or payable is *the total payment made or to be made by the buyer to or for the benefit of the seller for the import-*

*ed goods.* The payment need not necessarily take the form of a transfer of money... Payment may be made directly or indirectly...." Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Annex I, Interpretative Notes, Note to Article 1, "Price Actually Paid or Payable," 1994 WL 761483 (GATT) (emphasis added) (hereinafter "1994 GATT Interpretive Note").

the imported merchandise. TAA 43. However, "[a]ll other interest payments associated with imported goods, including those paid to a seller and relating to the purchase of specific goods (TAA 14 and 31) were considered dutiable." TD 85–111; *see also* TAA No. 14 (holding that interest charges separately identified from the price payable were to be included in transaction value); *see also* TAA 31.

In 1985, Customs promulgated TD 85–111 in order to implement an April 26, 1984 decision on the treatment of interest charges made by the Committee on Customs Valuation of the GATT. TD 85–111 closely mirrors the operative language of the GATT Committee's "Decision of the Treatment of Interest Charges in the Customs Value of Imported Goods."

> Charges for interest under a financing arrangement entered into by the buyer and relating to the purchase of imported goods shall not be regarded as part of the customs value provided that:
>
> (a) the charges are distinguished from the price actually paid or payable for the goods;
>
> (b) the financing arrangement was made in writing;
>
> (c) where required, the buyer can demonstrate that
>
> Such goods are actually sold at the price declared as the price actually paid or payable, and
>
> The claimed rate of interest does not exceed the level for such transactions prevailing in the country where, and at the time when the finance was provided.

Decision of the Treatment of Interest Charges in the Customs Value of Imported Goods, GATT Committee on Customs Valuation, April 26, 1984, *reprinted in* TD 85–111, Annex A—General Agreement on Tariffs and Trade (hereinafter "1984 GATT Committee decision").

In the text accompanying the operative TD 85–111 factors, Customs stated that the 1984 GATT Committee decision had prompted it to reassess the position it had taken in its prior letter rulings. *See* T.D. 85–111, *Background.* Noting that it was "impossible in many instances to distinguish interest payments relating to the purchase of specific goods from interest payments made as a part of an overall financing arrangement," Customs adopted the more specific criteria of TD 85–111. *Id.*

## A.

 We must first consider whether TD 85–111 is consistent with the statute. Although all the detailed criteria of TD 85–111 cannot be found in the explicit language of the statute, we think that the statute must be interpreted to be consistent with GATT obligations, absent contrary indications in the statutory language or its legislative history. *See Fed.–Mogul Corp. v. United States,* 63 F.3d 1572, 1581 (Fed.Cir.1990) ("[A]bsent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations."). Here there are no such contrary indications. The GATT approach is quite consistent with the statute. Like 19 U.S.C. § 1401a(b)(4)(A), the GATT broadly defines "price actually paid or payable." *See* 1994 GATT Interpretive Note. GATT is also consistent with the policy of the statute. The GATT parameters not only provide a uniform method to evaluate when "interest" charges are included in transaction value, but they also serve to prevent importers from manipulating the amount of duties assessed on particular merchandise by simply designating part of the payment made for that merchandise as

"interest." Without a policy that requires both sufficient documentation of the transaction, and evidence of comparable prevailing rates and sales, an importer could easily reduce the "price actually paid or payable" of the goods by denominating charges that actually represented a portion of the price of the goods as "interest." Thus, we construe the statute to make it consistent with GATT.

Under that construction, TD 85–111 is consistent with the statute because it is the same as GATT. Like the 1984 GATT Committee decision on the treatment of interest charges, TD 85–111 does not only apply to "unitary prices." *See* 1984 GATT Committee decision. Rather, it serves as a tool to evaluate all "[c]harges for interest under a financing arrangement entered into by the buyer and relating to the purchase of imported goods." *Id.* TD 85–111, like the 1984 GATT Committee decision, includes a criterion that the charges be separately documented from "the price actually paid or payable for the goods." *Id.* (stating the criterion that "[t]he charges are distinguished from the price actually paid or payable for goods."). TD 85–111 and the 1984 GATT Committee decision are otherwise identical. Both include the requirements that the financing arrangement be made in writing; the buyer can demonstrate that the goods are actually sold at the price declared as the price paid or payable; and the buyer can demonstrate that the claimed rate of interest does not exceed the rate for such transactions prevailing in the country where and at the time when the financing was provided. *Id.;* TD 85–11. Thus, in all relevant respects, TD 85–111 and the 1984 GATT Committee decision set forth the same criteria.

### B.

■ Bormioli roots its arguments within this backdrop. Bormioli contends that there is a significant difference between Customs' prior letter rulings (TAA 14, 31, 43) on the one hand, and TD 85–111 on the other. According to Bormioli, both the 1984 GATT Committee decision and TD 85–111 expressly apply only to interest payments that are "included in the price actually paid or payable" and thus part of a "unitary price" for the merchandise. It argues that "separately invoiced" interest charges were, and continue to be, governed by a separate Customs policy set forth in TAA 43. It therefore argues that TD 85–111 does not apply to the facts of this case because Bormioli Italy separately invoiced Bormioli's interest payments and did not merely "include" the interest payments in a single price for the merchandise. Instead, Bormioli argues that TAA 43 applies and requires only that Bormioli's interest payment be made as part of an "overall financing arrangement" in order to be excluded from the transaction value of the merchandise.

We disagree. Bormioli confuses the legal inclusion of a charge in the "price actually paid or payable" with the physical listing or invoicing of the "price actually paid or payable." Whether or not a charge is "included" in the "price actually paid or payable" is, in part, a legal construct. *See* 19 U.S.C. § 1401a(b)(4)(A) ("The term 'price actually paid or payable' means the total payment (whether direct or indirect ...) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller"); *see also* 1994 GATT Interpretive Note. Charges may be legally "included in" the "price actually paid or payable" even if the seller "separately" listed or invoiced the charges from the price of the merchandise. *See Generra Sportswear Co.,* 905 F.2d at 378–79 (quota charges invoiced separately from the "price" of the merchandise were never-

theless included); *see also All Channel Products v. United States*, 982 F.2d 513–514 (Fed.Cir.1992) (foreign inland freight charges separately identified on the invoices for the merchandise were included in "price actually paid or payable" pursuant to 19 U.S.C. § 1401a(b) and applicable regulations); 19 C.F.R. § 152.103 (1999) (providing detailed instructions and examples for calculating the "price actually paid or payable," e.g. adding $350 to the $1850 "price" paid where the $350 represented an indirect payment settling a debt owed by the seller). However, where a charge must be "separately identified" from "the price actually paid or payable," then physical documentation of that charge separately from the documentation of "the price actually paid or payable" (rather than merely the constructive legal inclusion of the charge in the price), is at issue. *See, e.g.*, 19 U.S.C. § 1401a(b)(3) (allowing items "separately identified" from the "price actually paid or payable" and other costs to be excluded from transaction value).

TAA 43 and TD 85–111 are both consistent with this statutory usage. Contrary to Bormioli's interpretation, TAA 43 distinguishes the documentation of a charge from the legal inclusion of the charge in the "price actually paid or payable." *See* TAA 43 (stating that where, among other required conditions, a "financing arrangement [is] fully documented as being separate from the import transaction," interest payments under the arrangement would not be part of the "price actually paid or payable" for the imported merchandise). Further, TAA 43 did not indicate that Customs would exclude *any* separately-

invoiced interest charges from transaction value, but only those in "overall financing arrangements" in the factual circumstances set forth in the ruling. *See* TAA No. 43 (noting, among other things, that the financing arrangement bore "no relationship to a particular sale," the supplier had the right to renegotiate the interest rate if the going rate changed sufficiently, and the financing arrangement was "fully documented . . ."). Even under TAA 43, the mere fact that an interest charge was separately invoiced or listed would not in itself ensure that that charge would be excluded from the "price actually paid or payable" of the merchandise. *See* TAA No. 43; TD 85–111, *Background* ("All other interest payments . . . were considered dutiable").[4] Nor did TD 85–111 establish a separate valuation policy for "unitary price" interest charges. Instead, it provided more focused criteria for determining the circumstances under which interest payments would be excluded from transaction value. Indeed, one of the criteria for the exclusion of interest charges under TD 85–111 is that the charges be "separately identified from the price actually paid or payable for the goods." TD 85–111, *Background.*

This criterion in TD 85–111 collapses Bormioli's proposed distinction. According to Bormioli's view, these interest charges with "separately invoiced" prices should be evaluated only pursuant to TAA 43. Moreover, in TD 85–111, Customs explicitly stated that it "reevaluated" its prior position as set forth in TAA 13, 31 and 43, and would instead abide by the criteria set forth in TD 85–111. Bormioli's

---

4. Moreover, most of the TD 85–111 factors are similar to the facts noted in TAA 43 (e.g., in TAA 43, the financing transaction was "fully documented" as being separate from any specific sale, while TD 85–111 requires interest charges to be separately identified and the financing arrangement to be in writing; further, in TAA 43, the seller could renegotiate the interest rate to reflect the going rate, while TD 85–111 allows Customs to require proof from the buyer that the interest rate paid is equivalent to the going rate).

argument that the more amorphous TAA 43 letter ruling would trump the TD 85–111 policy is disingenuous in light of Customs' statement. Finally, Customs also expressly stated in TD 85–111 that interest payments would be excluded from the transaction value of the merchandise if the TD 85–111 criteria were met "whether or not" the payments were "included in the price actually paid or payable." TD 85–111, *Background.* Thus, TD 85–111 would apply to Bormioli's purported interest charges "whether or not" they were "included in the price actually paid or payable"—regardless .of whether Customs used this term here in a constructive or documentary sense.

Therefore, the Court of International Trade did not err in applying TD 85–111 to Bormioli. TD 85–111 applies to interest payments whether or not they are invoiced or listed separately from the declared "price" of the merchandise. TAA 43 does not apply because it was superseded by TD 85–111.

### C.

Bormioli makes two brief additional arguments challenging TD 85–111. First, without citation to any authority, Bormioli contends that it is "well settled that interest payments are not dutiable . . . as part of the price paid or payable. . . ." It briefly argues that its payments to Bormioli Italy constitute "interest" under dictionary definitions of the term, and that the Court of International Trade should have ignored the TD 85–111 factors to the extent that they provide an alternative definition of interest.

■ As outlined above, the relevant statute defining the "price actually paid or payable" for the merchandise is inclusive. *See* 19 U.S.C. § 1401a(b)(4)(A) (" '[P]rice actually paid or payable' means *the total payment* (whether direct or indirect . . .)

*made, or to be made, for imported merchandise* by the buyer to, or for the benefit of, the seller.") (emphases added); *see also Generra Sportswear Co.,* 905 F.2d at 379–80 ("'[P]rice actually paid or payable" includes payments even where the payment "represents something other than the per se value of the goods."). The statute does not suggest that "interest" payments are excluded. According to the statute, if a payment was made by the buyer to the seller "for the merchandise," it is to be included in the price paid or payable. *Id.* If a payment was not made "for the merchandise," then the payment would be excluded. Bormioli's focus on dictionary definitions of "interest" begs the question.

■ Second, Bormioli draws our attention to the IRS's statement that the disputed charges are interest charges. *See* June 13, 1996 Internal Revenue Service Notice of Proposed Adjustment, IRS Form 5701, *Int'l Examiner's Position* ("Included within the 'Corporate Charges' paid by the taxpayer were interest payments to the parent corporation."). Bormioli argues that Customs should not be permitted to make a contrary determination to that of the IRS. We disagree with Bormioli's premise. The IRS evaluated whether Bormioli's payments constituted taxable income under the tax laws. *See* 26 U.S.C. §§ 871(a), 881(a), 1441(a); IRS TD 8734, 62 Fed. Reg. 53387–01 (Oct. 14, 1997) ("Income taxable . . . includes interest, dividends, royalties, compensation, other fixed or determinable annual or periodical . . . income and certain gains."). For the purposes of the tax laws at issue, it was not imperative for the IRS to distinguish one type of taxable income (e.g., "interest") from another (e.g., "other fixed or determinable annual or periodical income"). The IRS did not determine whether Bormioli's payments were excluded from

transaction value for customs purposes pursuant to 19 U.S.C. § 1401a. Therefore, Customs is not bound by the IRS' statement that Bormioli's payments were interest.

## II.

■ Finally, the Court of International Trade did not err in granting the United States summary judgment that Bormioli's interest payments did not satisfy the TD 85–111 criteria. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." U.S.Ct. Int'l Trade Rule 56(c).

There is no dispute that Bormioli's payments meet the first criteria of TD 85–111: that the charges be "identified separately from the price actually paid or payable for the goods." Bormioli Italy billed the 15 percent annual interest charge (1.25 percent per month) on a "corporate charge invoice" separate from Bormioli Italy's invoices to Bormioli for the glassware itself. However, each of the remaining criteria is disputed. For the reasons set forth below, Bormioli's attempt to create a factual dispute sufficient to negate summary judgment fails.

Bormioli argues first that it satisfied the criterion that "the financing arrangement in question was made in writing." *See* TD 85–111. It contends that the January 8, 1987, December 11, 1987, and June 8, 1989 letters from Bormioli Italy to Bormioli constitute the written financing agreement required by TD 85–111. Bormioli acknowledges that the parties departed from the terms of these letters. However, it argues that these departures at most mean that the parties modified a term of the contract through course of conduct or that

there was a breach of the agreement—not that the agreement did not exist.

We agree that the parties to a written financing arrangement may contractually modify the terms of their agreement. However, for the financing arrangement to comport with TD 85–111, the modifications also must be in writing. Further, while Customs may choose to ignore a de minimis variation from the terms of a written financing arrangement, the parties' repeated violation of the salient terms of the arrangement must remove it from coverage under TD 85–111. TD 85–111 does not merely require that the parties have a written financing arrangement, but that the written financing arrangement actually govern the payments at issue. *See* TD 85–111 (requiring that the financing arrangement "in question" be in writing); *see also* 1984 GATT Committee decision (referring to "[c]harges for interest under a financing arrangement entered into by the buyer and relating to the purchase of imported goods . . . ." and requiring such financing arrangement to be in writing). Were it otherwise, the parties could manipulate the transaction by setting up a "written financing arrangement" without adhering to any of its terms.

Bormioli Italy's letter agreement with Bormioli had only three essential terms: (1) the rate of interest to be charged (the prime rate in Italy in effect at the time), (2) the frequency of billing for interest charges (quarterly), and (3) the deadlines for payment of principal (within 180/120/90 days of invoice). The record reflects that Bormioli and Bormioli Italy did not adhere to any of these terms. While the average prime rate in Italy in 1996 was 11.1 percent, the rate for Bormioli's interest payments was 15 percent. Rather than making its interest payments quarterly, Bormioli made payments on six to twelve months of accrued charges. Final-

ly, Bormioli frequently paid its outstanding invoices after the 90–day deadline (from one to 22 days later). We conclude that the Court of International Trade correctly held that Bormioli did not demonstrate that it met TD 85–111's criterion that its financing arrangement with Bormioli Italy for the subject charges was in writing.

Because the TD 85–111 requirements are conjunctive, we need not address whether Bormioli satisfied the final requirement: that "where required by Customs, the buyer can demonstrate that [1][t]he goods undergoing appraisement are actually sold at the price declared as the price actually paid or payable, and [2][t]he claimed rate of interest does not exceed the level for such transaction prevailing in the country where, and at the time, when the financing was provided." *See* TD 85–111. For these reasons, the judgment of the Court of International Trade is

*AFFIRMED.*