Slip Op. 04 - 8

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -x

VANETTA U.S.A. INCORPORATED,      :

        Plaintiff, :
                              Consolidated
          v.            :  Court No. 97-01-00117

UNITED STATES,             :

        Defendant. :

- - - - - - - - - - - - - - - - - - - -x

Opinion

[Upon classification of animal-feed additives,
 judgment for the plaintiff.]

Decided: January 29, 2004

Barnes, Richardson & Colburn (James S. O'Kelly, Alan Goggins and Kevin J. Sullivan) for the plaintiff.

Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Bruce N. Stratvert), for the defendant.

AQUILINO, Judge:   Although the parties' cross-motions for summary judgment herein served to condense their controversy, the court concluded in slip op. 03-67, 27 CIT ___ (June 25, 2003), familiarity with which is presumed, that the opinions of their respective experts on the definitive issue(s) had to be subjected to cross-examination at a trial.  That examination has taken place, and counsel for both sides have now filed briefs thereon commensurate with their excellent conduct thereof.

I

The motion papers showed the imported merchandise in question to be menadione sodium bisulfite ("MSB"), menadione sodium bisulfite complex ("MSBC"), menadione dimethylpyrimidinol bisulfite ("MPB"), or menadione nicotinamide bisulfite ("MNB"), each of which substance is added to animal feeds. After ingestion, the menadione in these products is converted into a form of vitamin $K_2$, specifically $K_{2(20)}$.[1] The parties agree that $K_1$ and $K_2$ are vitamins for purposes of the Harmonized Tariff Schedule of the United States ("HTSUS"), classified under heading 2936, and that the chemical structures of naturally-occurring vitamin $K_1$ ("phylloquinone") and vitamin $K_2$ ("menaquinones") are 2-methyl-3-phytyl-1, 4-naphthoquinone, and 2-methyl-3-alltrans-polyprenyl-1, 4-naphthoquinone, respectively. See Slip Op. 03-67, p. 4, 27 CIT at ___.

The U.S. Customs Service declined to classify plaintiff's goods under HTSUS heading 2936 on the ground that it does not cover "synthetic substitutes for vitamins", the essence of which was defined in the motion papers as

> a synthesized chemical compound that is not found in nature but has vitamin activity. This differs from a

_____

[1] See Slip Op. 03-67, p. 4, 27 CIT at ___. As stated at the trial,

> the well-defined role of Vitamin K is to synthesize proteins that are needed for normal blood coagulation. In the absence of Vitamin K[,] animals can experience hemorrhagic events.

Transcript ("Tr."), pp. 13-14. Cf. id. at 20.

synthetically reproduced vitamin whose structure is found in nature but has been synthesized from other chemicals.[2]

Whereupon the defendant rests on HTSUS heading 2914 ("Ketones and quinones, whether or not with other oxygen function, and their halogenated, sulfonated, nitrated, or nitrosated derivatives") or heading 2933 ("Heterocyclic compounds with nitrogen hetero-atom(s) only; nucleic acids and their salts") as the correct classification(s).[3]

A

The trial was conducted pursuant to a pretrial order, Schedule C of which set forth the following uncontested facts:

---

[2] Slip Op. 03-67, p. 5, 27 CIT at ___. The defendant asserts now as a contested fact that

> Customs excluded the imported products from classification under Heading 2936 because they are not natural precursors of the natural vitamins $K_1$ and $K_2$, they are not naturally occurring vitamins, they are not synthetic reproductions of naturally occurring vitamins, nor are they derivatives thereof, they are not provitamins within the meaning of Heading 2936, and because of the exclusions in the HTSUS Explanatory Notes for Heading 2936.

Pretrial Order, Schedule C-2, para. 15. See also Defendant United States' Proposed Findings of Fact and Conclusions of Law [hereinafter referred to as "Defendant's Post-Trial Brief"], p. 2.

[3] See Defendant's Post-Trial Brief, p. 2. On its part, the plaintiff reiterates that,

> [w]hile the parties agree that heading 2914 and 2933 describe the imported merchandise, if such merchandise is also described under heading 2936, that heading prevails in accordance with headnote 3 to HTSUS Chapter 29.

Plaintiff's Post-Trial Brief, p. 1 n. 2. See Slip Op. 03-67, pp. 8-9, 27 CIT at ___.

1.  The principal use of the imported products is as a component in animal feed premixes, in particular poultry feed premixes, to provide vitamin K nutrition to the animal.

2.  Vitamin $K_1$ (phylloquinone) and vitamin $K_2$ (menaquinones) are not used in animal feeds because they are too unstable to withstand the feed pellet manufacturing process and too costly in comparison with the imported MSB, MSBC, MPB or MNB.

3.  Menadione is a highly reactive substance which must be derivatized before it can be used commercially in the production of animal feeds.

4.  A provitamin is a substance that, after ingestion, is converted into a vitamin by the human or animal body.

5.  After ingestion, the menadione in MSB, MSBC, MPB and MNB is converted into menaquinone-4 in the liver of the chicken by a natural process.

6.  Menadione has been found in the Asplenium *Laciniatum* fern and in the husks of Black and English walnuts.  The chemical structure of naturally occurring menadione is 2-methyl-1, 4[-]naphthoquinone.

7.  Menadione sodium bisulfite was first synthesized by Moore and Kirchmeyer, which resulted in U.S. Patent No. 2,367,302, patented January 16, 1945.  . . .

8.  Menadione Dimethylpyrimidinol Bisulfite was first synthesized by Nanninga, which resulted in U.S. Patent No. 3,325,169, patented June 27, 1967.  . . .

9.  The products imported by plaintiff, MSB, MSBC, MPB, and MNB[,] are derivatives of menadione.


Given these representations in the pretrial order, the plaintiff submits that the central issue before the court in this case is whether menadione is a natural provitamin.  See Tr., p. 6. On its part, the defendant also listed this as the number one issue but proceeded to propound five additional questions about the

specific "products in issue".[4]  All of them focus, of course, on

the meaning of HTSUS heading 2936:

> Provitamins and vitamins, natural or reproduced by syn-
> thesis (including natural concentrates), derivatives
> thereof used primarily as vitamins, and intermixtures of
> the foregoing, whether or not in any solvent[.]

(1)

The answer to the first issue is clear on the record

developed herein.  As the parties have stipulated, a provitamin is

a substance that is converted within the body of an animal into a

vitamin after ingestion. See, e.g., Tr., pp. 12, 14, 180.  Again as

stipulated, menadione has been determined to exist in nature. See,

e.g., Plaintiff's Exhibit 4 and Defendant's Exhibit P (Binder,

Benson & Flath, Eight 1,4-Naphthoquinones from Juglans, 28 Phyto-

chemistry 2799 (1989)); Plaintiff's Exhibit 5 and Defendant's

Exhibit Q (Gupta, Khanna & Sharma, Chemical Components of Asplenium

Laciniatum (1976)); Tr., pp. 16-17, 35, 140-41, 162-63.  And, after

ingestion by a chicken, menadione is converted into a form of

vitamin $K_2$, specifically, vitamin $K_{2(20)}$ or menaquinone-4.  Compare

Slip Op. 03-67, p. 4, para. 11, 27 CIT at ___, with Pretrial Order,

---

[4] Compare Pretrial Order, Schedule F-1, with id., Schedule F-
2.  Now, the plaintiff asserts that "the Court conducted a trial to
determine whether the imported products are derivatives of a
natural provitamin."  Plaintiff's Post-Trial Brief, p. 2.

To be sure, the parties, not the court, essentially conducted
the trial, during which and after which the undersigned has been
concerned with more than just this issue.

Schedule C, para. 5 <u>and</u> Tr. pp. 17-18, 33, 167-69, 187-88.  Where-

upon the plaintiff would now limit the

> issues for this Court to decide [to] whether menadione is
> a "natural" provitamin and whether the imported products
> are used primarily as vitamins.

Plaintiff's Post-Trial Brief, pp. 2-3.

The HTSUS, at least chapter 29 thereof, does not define

natural.  Its predecessor Tariff Schedules of the United States

("TSUS") did define "natural substances" as

> those substances found in nature which comprise whole
> plants and herbs, anatomical parts thereof, vegetable
> saps, extracts, secretions and other constituents
> thereof; whole animals, anatomical parts thereof, glands
> or other animal organs, extracts, secretions and other
> constituents thereof, and which have not had changes made
> in their molecular structure as found in nature[.]

TSUS Schedule 4, Part 3, Headnote 3(a) (1986).  And Customs has let

it be known that TSUS definitions

> are applied by [it] to the HTSUS, in the absence of
> specific definitions, since these definitions are com-
> monly accepted and it is clear from the wording of the
> HTSUS provisions that the same distinction between
> natural and synthetic is intended.

HQ 086658, p. 2 (March 21, 1990).  In <u>Schering Corporation v.</u>

<u>United States</u>, 1 CIT 217, 219 (1981), the court pointed out that,

for a substance to be natural within the meaning of the foregoing

TSUS headnote 3(a),

> (1) It must be found in nature in a vegetable or animal
> source; and (2) it cannot have had changes made in its
> molecular structure as found in nature.

Moreover, absent contrary legislative intent, tariff terms can be construed in accordance with their common or popular meaning. E.g., <u>Marubeni America Corp. v. United States</u>, 35 F.3d 530, 534 (Fed.Cir. 1994). And, to

> assist it in ascertaining the common meaning of a tariff term, the court may rely upon its own understanding of the terms used and it may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources.

<u>Brookside Veneers, Ltd. v. United States</u>, 847 F.2d 786, 789 (Fed.Cir. 1988). Here, this court can and does accept "natural" as the pristine adjectival reference to proven existence in nature[5], notwithstanding the fact that certain lexicographers and parsers of the English language have sought to expand this seminal usage to the limits of human experience. <u>See</u>, <u>e</u>.<u>g</u>., Webster's New International Dictionary of the English Language, 2d ed. Unabridged, pp. 1630-31 (1945); Funk & Wagnalls Standard Dictionary of the English Language, Int'l ed., pp. 845-46 (1963). Whichever approach, the court finds menadione to be a natural provitamin. <u>See</u>, <u>e</u>.<u>g</u>., Tr., p. 189.

(2)

The answer to the second triable issue posited by the defendant in its schedule F-2 to the pretrial order, namely, whether the products under consideration are natural vitamins or natural provitamins, is also clear. They are neither. As far as this record is concerned, none has been found to exist in nature,

---

[5] <u>Cf</u>. Tr., pp. 12, 13.

and the court can only find that none would exist but for the ingenuity of man.

(3)

Defendant's next issue is whether plaintiff's products are reproductions by synthesis of natural vitamins or natural pro-vitamins.   The court cannot find that they are, nor does the plaintiff argue otherwise.

(4)

The defendant articulates its remaining "triable issues" as follows:

> 4.  Whether the products in issue are derivatives, used primarily as vitamins, of natural vitamins or natural provitamins.
>
> 5.  Whether the bisulfite adducts of menodione [*sic*], in issue, represent an "added stabilizer," within the meaning of HTSUS Chapter 29 Note 1(f).
>
> 6.  Whether the products in issue are intermixtures of: provitamins and vitamins, natural or reproduced by syn-thesis, and/or derivatives thereof used primarily as vi-tamins.[6]

---

[6] Pretrial Order, Schedule F-2.  The HTSUS headnote 1 referred to provides that the headings of chapter 29 apply, in part, only to:

> (a)  Separate chemically defined organic compounds, whether or not containing impurities;
>
> (b)  Mixtures of two or more isomers of the same organic compound (whether or not containing impurities), except mixtures of acyclic hydro-carbon isomers (other than stereoisomers), whether or not saturated (chapter 27);
>
> (c)  The products of headings 2936 to 2939 or the sugar ethers and sugar esters, and their

(footnote continued)

The answer to number 4 is in the affirmative, given the record

support, <u>supra</u>, for the court's finding that menadione is a natural

provitamin and the parties' above-numbered stipulated fact 9 that

MSB, MSBC, MPB and MNB are derivatives[7] of menadione.  <u>See</u> Tr., pp.

_____

> salts, of heading 2940, or the products of
> heading 2941, whether or not chemically de-
> fined;

(d)  Products mentioned in (a), (b) or (c) above
     dissolved in water;

(e)  Products mentioned in (a), (b) or (c) above
     dissolved in other solvents provided that the
     solution constitutes a normal and necessary
     method of putting up these products adopted
     solely for reasons of safety or for transport
     and that the solvent does not render the pro-
     duct particularly suitable for specific use
     rather than for general use;

(f)  The products mentioned in (a), (b), (c), (d)
     or (e) above with an added stabilizer nec-
     essary for their preservation or transport;
     . . ..

[7] In answering an interrogatory propounded by the plaintiff
pretrial, the defendant stated that, for

> purposes of Heading 2936, a chemical derivative is a
> compound containing the same basic structure as its
> theoretical parent compound without any significant
> portion of the parent compound having been removed.  Our
> definition is consistent with the definition in HRL
> 085775, dated February 27, 1990, which states: "a
> derivative of a compound results from the modification of
> that compound by adding to the moiety or the basic
> structure of the compound without loss of that basic
> structure."

Plaintiff's Exhibit 15 [Defendant's Response to Plaintiff's First
Interrogatories], p. 3, para. 9; Tr., p. 28.  The defendant pointed
in subsequent paragraph 12 of its Response to definitions of
derivatives found in Hackh's Chemical Dictionary, Webster's Third
New International Dictionary, and in the sixth edition of Van
Nostrand's Scientific Encyclopedia.  <u>See</u> Tr., pp. 28-29. <u>Cf</u>. <u>id</u>. at
70-71.

28-29, 66, 104, 173, 196.  See also Defendant's Post-Trial Brief,
pp. 4-5, 22-23.  Moreover, the evidence shows that the bisulfite
adducts of these products are stabilizers necessary for their
preservation or transport.  See, e.g., Tr., pp. 66, 184; Slip Op.
03-67, p. 6, para. 23, 27 CIT at ___.  Finally, the primary if not
only use of these products shown on the record is "to provide
vitamin K nutrition to the animal." Pretrial Order, Schedule C,
para. 1.  This occurs within the body of the animal when the sodium
bisulfite stabilizer becomes disassociated (and then excreted),
leaving the provitamin menadione for conversion to vitamin $K_{2(20)}$.
See, e.g., Tr., pp. 25-26, 44, 53, 78-79, 112, 149, 167-68, 178-79.

B

The defendant has admitted that HTSUS heading 2936 covers
"synthetic derivatives of naturally occurring vitamins or pro-
vitamins".  Plaintiff's Exhibit 17 [Defendant's Response to Plain-
tiff's First Request for Admission], p. 1, para. 1.  Indeed, the
Explanatory Notes to that heading emphasize this point.  See De-
fendant's Exhibit N, p. 462, para. (a).  Moreover, the HTSUS
chapter 29 subheading note 1 states:

> Within any one heading of this chapter, derivatives of a
> chemical compound (or group of chemical compounds) are to
> be classified in the same subheading as that compound (or
> group of compounds) provided that they are not more
> specifically covered by any other subheading and that
> there is no residual subheading named "Other" in the se-
> ries of subheadings concerned.

The defendant refers the court to that part of the Explanatory Notes to HTSUS heading 2936 which would exclude from its coverage "[s]ynthetic substitutes for vitamins", listing, among others,

> Vitamin $K_3$: menadione, menaphthone, methylnaphthone or 2-methyl-1, 4-naphthoquinone; sodium salt of 2-methyl-1, 4-naphthoquinone bisulphite derivative (**heading 29.14**); Menadiol or 1,4-dihydroxy-2-methylnaphthalene (**heading 29.07**).

Defendant's Exhibit N, p. 468, para. (2)(a) (bold face in original).

The plaintiff claims that this exclusion misses the mark -- as proven in this case. First, at the time of publication in 1964 of the Third Impression of the Brussels Nomenclature, menadione was considered to be a form of vitamin K and given the subscript 3. Since then, science has concluded that menadione is not a vitamin, rather a provitamin for menaquinone-4, a form of vitamin $K_2$. See Tr., pp. 33-34. Hence, $K_3$ is no longer the proper reference. See id. at 33-34, 57, 120. Second, menadione has since been discovered in nature. It is not a synthetic substitute for a vitamin, nor are provitamins such synthetic substitutes.

The courts have consistently pointed out that the HTSUS Explanatory Notes are not legally binding but that they may be consulted for guidance and are generally indicative of the proper interpretation of the various provisions of the Harmonized Tariff

Schedule.  See, e.g., Park B. Smith, Ltd. v. United States, 347 F.3d 922, 929 n. 3 (Fed.Cir. 2003); Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1050 (Fed.Cir. 2001); Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 n. 1 (Fed.Cir. 1999); Intercontinental Marble Corp. v. United States, 27 CIT __, __, 264 F.Supp.2d 1306, 1320 (2003); Toy Biz, Inc. v. United States, 26 CIT ____, ____, 219 F.Supp.2d 1289, 1293-94 (2002); North American Processing Co. v. United States, 23 CIT 385, 387 n. 5, 56 F.Supp.2d 1174, 1176 n. 5 (1999), aff'd, 236 F.3d 695 (Fed.Cir. 2001).

To consider the above-quoted exclusionary note is to lead the court to conclude that it is not of moment in this case.  To repeat, menadione is a natural provitamin.  See, e.g., Tr., p. 31. It is not a synthetic substitute for vitamin K, nor are the bisulfite adducts that simply stabilize the "highly reactive substance" that is menadione on its intended path to a chicken's liver.  Moreover, the court notes in passing that a subsection of that exclusionary note (2), namely, "(d) Cysteine, a vitamin B substitute (**heading 29.30**)", seems out of place[8] in that the other four lettered subsections, (a), (b), (c) and (e), at least refer to forms of K, the vitamin at issue herein.  In short, all that the record developed herein supports is a finding that the note(s) at bar could stand some correction and updating.

---

[8] See Tr., pp. 75, 177-78.

II

As pointed out in slip opinion 03-67, the court first construes the language of an HTSUS heading, and any relevant section or chapter notes, to determine whether merchandise at issue is classifiable under that heading.  Only after determining that it is classifiable thereunder should the court look to subheadings to determine the correct classification of the particular good.  27 CIT at ___, quoting Orlando Food Corp. v. United States, 140 F.3d 1437, 1440 (Fed.Cir. 1998); Schulstad USA, Inc. v. United States, 26 CIT ___, ___, 240 F.Supp.2d 1335, 1338 (2002).  Three subheadings of heading 2936 have the same setting in the matrix, to wit, 2936.10.00 ("Provitamins, unmixed"), 2936.21.00 ("Vitamins and their derivatives, unmixed"), and 2936.90.00 ("Other, including natural concentrates").  Clearly, plaintiff's products are not vitamins and their derivatives within the purview of subheading 2936.21, nor are they provitamins, unmixed per 2936.10.00.  Ergo, each of them falls within the basket provision, subheading 2936.90.00.  Cf. Plaintiff's Post-Trial Brief, p. 17:

> . . . [E]ven if heading 2936 does not by its very terms include synthetic derivatives of provitamins, Subheading Note 1 directs the classification of such derivatives therein, specifically, under subheading 2936.90.0000, HTSUS.

III

In view of the foregoing, which represents this court's findings of fact and conclusions of law within the meaning of USCIT Rule 52(a), the summary "LAW AND ANALYSIS" set forth in HQ 957946 (Dec. 10, 1996) and HQ 950338 (Feb. 16, 1993), which the defendant offered in evidence as exhibits Y and Z and upon which it now relies[9], is not controlling.  As the Supreme Court explained in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), and reaffirmed in United States v. Mead Corp., 533 U.S. 218, 228 (2001), the

> weight [accorded an administrative ruling] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, [even] if lacking power to control.

Here, defendant's classification of plaintiff's products under HTSUS chapter 29 (1994) is entitled to deference, but not to the extent of foreclosure of their most correct classification under subheading 2936.90.00 in accordance with headnote 3 to that chapter.  Judgment will enter accordingly.

Decided:  New York, New York
          January 29, 2004

                                    Thomas J. Aquilino, Jr.
                                              Judge

---

[9] See Defendant's Post-Trial Brief, p. 18.